*35 OPINION OF THE COURT
Jones, J.
The present amalgam of statutory prescriptions for State aid to local school districts for the maintenance and support of public elementary and secondary education does not violate the equal protection clause of either the Federal or the State Constitution nor is it unconstitutional under the education article of our State Constitution.
This declaratory judgment action challenging the State’s provisions for financing our public schools is prosecuted by two groups; representing different constituencies and mounting attacks based on different predicates. The original plaintiffs by which the action was instituted in 1974 are the boards of education of 27 school districts located at various sites in the State and 12 students of public schools located in some of those districts. The intervenors, whose participation in the action was agreed to by the original parties, are the boards of education, officials, resident taxpayers, and students of the Cities of New York, Buffalo, Rochester and Syracuse, together with a federation of parent and parent-teacher associations in the City of New York. Defendants are the Commissioner of Education, the University of the State of New York, the State Comptroller and the Commissioner of Taxation and Finance of the State of New York.[1]
It is the contention of the original plaintiffs (who are “property-poor” school districts) that the system for financing public schools presently in effect in this State (as principally set forth in Education Law, § 2022 [provision for local district financing]; and § 3602 [apportionment of State aid]) by which funds raised by locally imposed taxes are augmented by allocations of State moneys in accordance with a variety of formulas and grants, violates the equal protection clauses of both the State and the Federal Constitutions and the education article of our State Consti *36 tution because that system results in grossly disparate financial support (and thus grossly disparate educational opportunities) in the school districts of the State. The interveners, representing interests in school districts located in four of the largest cities in the State, also assert violations of the same State and Federal constitutional provisions as the result of circumstances said to be peculiar to cities which they contend place them in a position comparable to that of property-poor districts. Included in these circumstances, they assert, are special financial burdens borne by cities in four categories: (1) demands on municipal budgets (from which local funds for education are secured) for noneducation needs peculiar to cities (“municipal overburden”), (2) diminished purchasing power of the municipal education dollar, (3) significantly greater student absenteeism (with a resulting adverse effect both because of added operational costs and because State aid is largely allocated on the basis of average daily attendance), and (4) larger concentrations in cities of pupils with special educational needs, all four of which may be comprehended within the term “metropolitan overburden”. These factors are said to result in greatly disparate educational opportunities available to children in the cities’ public schools when compared to the offerings of some of the school districts not located within cities.
Succinctly stated, it is the gravamen of the complaint of the original plaintiffs (and the findings of the courts below provide factual support for their argument) that property-rich districts have an ability to raise greater local tax revenue enabling them to provide enriched educational programs beyond the fiscal ability of the property-poor districts. The inter venors argue that although they are not disadvantaged in their ability to raise gross revenue from local sources, in consequence of the economic factors of metropolitan overburden the net effective economic ability of the city districts falls well below that of noncity districts (and the factual determinations made below support their argument). Both then assert that State aid as presently granted serves to perpetuate, and even to exacerbate, these disparities.
*37 Both courts through which this litigation has progressed have granted declarations favorable to the original plaintiffs and to the intervenors, although not on all the claims asserted. Each court made careful and detailed factual determinations with respect to the financing of the State’s educational system, the operation of the various State aid statutory provisions, and their practical impact on various school districts, individually and comparatively. In the case of the Appellate Division there was consideration not only of the public school finance system as it existed at the time the action was commenced in 1974 but also of the effect of alterations accomplished by legislation up to and through chapters 53 and 148 of the Laws of 1981. In reaching our disposition we proceed on these factual determinations made by both courts below as to the details of the various school district programs and operations and their comparison with one another, as well as the impact on them of the present State aid programs.
After an extended nonjury trial which produced 23,000 pages of transcript and 400 exhibits, the Justice presiding issued a judgment declaring that the State’s public school finance system violates both the equal protection clause (art I, § 11) and the education article (art XI, § 1) of the State Constitution and, as to the cities whose interests are represented by the intervenors, the equal protection clause (14th Arndt, § 1) of the Federal Constitution as well. The Appellate Division, by a divided court, modified the judgment of the trial court; while concurring in the determination that the provisions of the State Constitution had been violated, the appellate court rejected the conclusion that the intervenors had also established a violation of the Federal Constitution. Justice Hopkins, concurring in part and dissenting in part, rejected all claims of denial of equal protection, but concluded that the present “maze of convoluted intricacies and provisos” of State aid fails to constitute a “basic State-wide fiscal system for education” as required in his view by the education article of the State Constitution (83 AD2d 217, 267-268). We now modify the order of the Appellate Division and direct that judgment be entered declaring that the present admixture of statutory provisions for State aid to local school districts, considered *38 in connection with the existing system for local financing, is constitutional under the equal protection clause of the Federal Constitution and under both the equal protection clause and the education article of the State Constitution.
•At the outset it is appropriate to comment briefly on the context in which the legal issues before us arise. Although New York State has long been acknowledged to be a leader in its provision of public elementary and secondary educational facilities and services, and notwithstanding that its per pupil expenditures for such purposes each year are very nearly the highest in the Nation,[2] it must be recognized that there are nonetheless significant inequalities in the availability of financial support for local school districts, ranging from minor discrepancies to major differences, resulting in significant unevenness in the educational opportunities offered.[3] These disparities may properly be ascribed in some respects to the wide variances between the property assessment bases on which local district taxes are imposed. Similarly, it may be accepted that the four major cities represented by the interveners, by reason of the factors encompassed in metropolitan overburden, are forced to provide instructional services and facilities of a lesser quantity, variety, and quality than those provided in some other school districts. No claim is advanced in this case, however, by either the original plaintiffs or the intervenors that the educational facilities or services provided in the school districts that they represent fqll below the State-wide minimum standard of educational quality and quantity fixed by the Board of Regents; their attack is directed at the existing disparities in financial resources which lead to educational unevenness above that minimum standard.
The determination of the amounts, sources, and objectives of expenditures of public moneys for educational purposes, especially at the State level, presents issues of enormous practical and political complexity, and resolu *39 tion appropriately is largely left to the interplay of the interests and forces directly involved and indirectly affected, in the arenas of legislative and executive activity. This is of the very essence of our governmental and political polity. It would normally be inappropriate, therefore, for the courts to intrude upon such decision-making (see Matter of Board of Educ. v City of New York, 41 NY2d 535, 538; Matter of Anderson v Krupsak, 40 NY2d 397, 402-403; New York Public Interest Research Group v Steingut, 40 NY2d 250, 257; cf. James v Board of Educ., 42 NY2d 357). With full recognition and respect, however, for the distribution of powers in educational matters among the legislative, executive and judicial branches, it is nevertheless the responsibility of the courts to adjudicate contentions that actions taken by the Legislature and the executive fail to conform to the mandates of the Constitutions which constrain the activities of all three branches. That because of limited capabilities and competences the courts might encounter great difficulty in fashioning and then enforcing particularized remedies appropriate to repair unconstitutional action on the part of the Legislature or the executive is neither to be ignored on the one hand nor on the other to dictate judicial abstention in every case. In the discharge of our judicial responsibility in this case, recognizing the existence of the very real disparities of financial support as found by the lower courts, we nonetheless conclude that such disparities do not establish that there has been a violation of either Federal or State Constitution.[4]
*40 Considering first the claim that the existing provisions for State aid to finance public education in this State violate the equal protection clause contained in the Fourteenth Amendment of the United States Constitution, we agree with the Appellate Division that this claim must fail. The equal protection argument as developed by the original plaintiffs is that, because what are termed property-rich districts (those districts having a greater amount of assessable real property per pupil) are able to generate, through local taxation approved by taxpayers in those districts, a larger amount of money per pupil for education than is generated through the same process of local tax approval by property-poor districts (resulting in a lower per pupil expenditure in the latter districts), the financial resources (and thus education programs and facilities) of the two groups are significantly unequal. The intervenors assert that, in the case of large cities, although the property wealth per pupil is not low, inequality is nevertheless occasioned by metropolitan overburden which likewise operates to diminish the available financial resources (and thus per pupil, expenditures) in those localities. The inequalities existing in property-poor and large city school districts, both argue, are perpetuated and magnified rather than remedied by the existing distribution of State funds allocated to education — apportioned as such funds are in accordance with a formula and variations thereof which supplement local school tax revenue only to the extent of assuring a minimum, uniform per pupil expenditure throughout the State, together with an additional flat grant for each pupil and “save harmless” or special aid provisions which are designed to compensate for inflationary increases in real property values and to ease the effect of decreasing pupil population.
The essence of the original plaintiffs’ argument — that disparities in per pupil expenditures, resulting largely from differences in the value of assessable property per *41 pupil among school districts, coupled with a failure by the State to offset such disparities by provision of compensating aid funds, constitute an impermissible discrimination against pupils in the less property-wealthy districts in violation of the Fourteenth Amendment — was considered and rejected by the Supreme Court of the United States in San Antonio School Dist. v Rodriguez (411 US 1). Noting that the subject of public school finance involves decisions both with respect to the raising and disposition of public revenues and of persistent, complex, and difficult questions of educational policy areas appropriately within legislative determination — the court held that rational basis, rather than strict scrutiny, was the proper standard against which to examine the Texas public school financing system there under review (which was described by the court as “comparable to the systems employed in virtually every other State” [at pp 47-48]). Applying this standard, the court found in the Texas system a rational relationship to a legitimate State purpose — the permission and encouragement of participation in and control of public schools at the local district level (at p 49). As both courts below acknowledged, the conclusions reached in that case dictate a similar result in the present litigation insofar as the original plaintiffs’ claim of a Federal Constitution violation is concerned.
With respect to the intervenors’ position in this litigation, not in haec verba put before or considerd by the Supreme Court in San Antonio, that metropolitan overburden is an unequalizing force which must be remedied by compensating increases in State aid to city school districts, a response is found in the opinion by Justice Hopkins at the Appellate Division, which observes that the cited inequalities existing in cities are the product of demographic, economic, and political factors intrinsic to the cities themselves, and cannot be attributed to legislative action or inaction. While unquestionably education faces competition in the contest for municipal dollars from other forms of public service for which nonmunicipal school districts bear no responsibility, municipal dollars flow into the cities’ treasuries from sources other than simply real property taxes — sources similarly not available to nonmunicipal *42 school districts. The disbursement of the funds received from real estate taxes and such other sources and the decisions as to how they shall be allocated are decisions to be made by municipal governmental bodies. In the words of Justice Hopkins: “It is beyond the power of this court in this litigation to determine whether the appropriations of the intervenor-plaintiffs have been wisely directed or reasonably applied, or whether their budgets are fairly divided in terms of priority of need between the competing services, such as police, fire, health, housing and transportation, and it is, equally, beyond the power of the court to determine whether the resources of the intervenor-plaintiffs can otherwise be employed so that their educational needs can be met.” (83 AD2d 217, 262.) Accordingly, we conclude that, applying the rational basis test, the intervenors have failed to demonstrate denial of equal protection under the Federal Constitution.
We turn then to the claims of both original plaintiffs and intervenors that, whatever may be determined with respect to the equal protection clause of the Federal Constitution, a violation of the comparable provision of our State Constitution (art I, § 11) has been demonstrated — the conclusion reached by both courts below. Our attention must first be directed to identification of the standard appropriate to the subject now before us (financial support for public education) for examination as to whether there has been a violation of our constitutional mandate of equal protection (Montgomery v Daniels, 38 NY2d 41, 59). The Appellate Division, declining to apply the measurement of strict scrutiny that had been employed by the trial court and under which the trial court had found the education finance system invalid, concluded that the intermediate or more careful scrutiny test described in Alevy v Downstate Med. Center of State of N. Y. (39 NY2d 326) was properly to be employed —justifying this decision by its conclusion that the right to education in this State “represents an important constitutional interest”. (83 AD2d, at p 241.) The choice of that intermediate standard, under which the appellate court also found the system invalid, cannot be *43 sustained however, both for the previously recited reasons articulated in the San Antonio case and in face of our decision in Matter of Levy (38 NY2d 653, app dsmd sub nom. Levy v City of New York, 429 US 805, reh den 429 US 966). In Levy we expressly held that rational basis was the proper standard for review when the challenged State action implicated the right to free, public education. Nothing in the present litigation impels a departure from that decision, made as it was with full recognition of the existence in our State Constitution of the education article (art XI).
The circumstance that public education is unquestionably high on the list of priorities of governmental concern and responsibility, involving the expenditures of enormous sums of State and local revenue, enlisting the most active attention of our citizenry and of our Legislature, and manifested by express articulation in our State Constitution, does not automatically entitle it to classification as a “fundamental constitutional right” triggering a higher standard of judicial review for purposes of equal protection analysis. Thus, in Matter of Bernstein v Toia (43 NY2d 437), where the concern was public assistance to the needy — clearly a matter of significant interest, provision for which is similarly included in our State Constitution[5] (art XVII, § 1) — we employed the rational basis test as the proper standard for review. The more careful scrutiny standard has been applied when the challenged State action has resulted in intentional discrimination against a *44 class of persons grouped together by reason of personal characteristics, the use of which called into question the propriety of the particular classifications (People v Whidden, 51 NY2d 457 [gender]; Matter of Fay, 44 NY2d 137, app dsmd sub nom. Buck v Hunter, 439 US 1059 [illegitimacy]; Matter of Lalli, 43 NY2d 65, affd sub nom. Lalli v Lalli, 439 US 259 [illegitimacy]). The Alevy case itself was one in which race was the factor which pervaded the reverse discrimination alleged by the petitioner.
No classification of persons is present in the case now before us, in which the claimed unequal treatment is among school districts resulting from disparity as to revenue available for educational purposes in consequence of unequal tax bases or unequal demands on local revenue. The claim is of discrimination between property-poor and property-wealthy school districts. No authority is cited to us, however, that discrimination between units of local government calls for other than rational basis scrutiny.
Our inquiry is therefore only whether there has been demonstrated the absence of a rational basis for the present school financing system, premised as it is on local taxation within individual school districts with supplemental State aid allocated in accordance with legislatively approved formulas and plans. Addressing the submissions of the original plaintiffs, our conclusion is that there has not been such a showing, and that the justification offered by the State — the preservation and promotion of local control of education — is both a legitimate State interest and one to which the present financing system is reasonably related.
Under the existing system the State is divided into more than 700 local school districts, each of which varies from the others and, from time to time, varies within itself, in greater or lesser degree, as to number of pupils and value of assessable real property, as well as with respect to numerous other characteristics, including personal wealth of its taxpayers. Outside the cities in the State (in which school funding is a part of the total municipal fiscal process), funds for the support of the education program offered in the schools of a district are raised through the imposition of local taxes following voter authorization *45 based on approval of a budget prepared and submitted by an elected board of education, reflecting the instructional program (within standards fixed by the State) perceived by the local board of education to be responsive to the needs and desires of the community. By way of assuring that a basic education will be provided and that a uniform, minimum expenditure per pupil will occur in each district, the Legislature has long provided for payment of supplementing State aid such that presently $1,885 per pupil (and, by a weighting computation, larger amounts for particular types of pupils) is available for education in each district. Throughout the State, voters, by their action on school budgets, exercise a substantial control over the educational opportunities made available in their districts; to the extent that an authorized budget requires expenditures in excess of State aid, which will be funded by local taxes, there is a direct correlation between the system of local school financing and implementation of the desires of the taxpayer.
It is the willingness of the taxpayers of many districts to pay for and to provide enriched educational services and facilities beyond what the basic per pupii expenditure figures will permit that creates differentials in services and facilities. Justification for a system which allows for such willingness was recognized by the Supreme Court of the United States in San Antonio School Dist. v Rodriguez (411 US 1, 48, n 102, supra) quoting with approval a statement which accompanied the State of Hawaii’s 1968 amendment of its educational finance statute to permit counties to collect funds locally and spend them on their schools over and above the wholly State-funded program: “Under existing law, counties are precluded from doing anything in this area, even to spend their own funds if they desire. This corrective legislation is urgently needed in order to allow counties to go above and beyond the State’s standards and provide educational facilities as good as the people of the counties want and are willing to pay for. Allowing local communities to go above and beyond established mínimums to provide for their people encourages the best features of democratic government.” (Hawaii Sess Laws, 1968, act 38, § 1.) Any legislative attempt to make *46 uniform and undeviating the educational opportunities offered. by the several hundred local school districts — whether by providing that revenue for local education shall come exclusively from State sources to be distributed on a uniform per pupil basis, by prohibiting expenditure by local districts of any sums in excess of a legislatively fixed per pupil expenditure, or by requiring every district to match the per pupil expenditure of the highest spending district by means of local taxation or by means of State aid (surely an economically unrealistic hypothesis) — would inevitably work the demise of the local control of education available to students in individual districts. The amicus brief filed on behalf of the 85 school districts puts it well: “For all of the nearly two centuries that New York has had public schools, it has utilized a statutory system whereby citizens at the local level, acting as part of school district units containing people with a community of interest and a tradition of acting together to govern themselves, have made the basic decisions on funding and operating their own schools. Through the years, the people of this State have remained true to the concept that the maximum support of the public schools and the most informed, intelligent and responsive decision-making as to the financing and operation of those schools is generated by giving citizens direct and meaningful control over the schools that their children attend.”
The State-wide $360-per-pupil flat grant provided by State aid legislation is immune from attack under the equal protection clause, for on its face there is no inequality in this per pupil distribution of State aid which is allocated to all school districts without differentiation. Nor does the fact that the “save harmless” or special aid grants accrue to the benefit of only those districts which stand to suffer identified harm by reason of changing property values or of diminishing pupil registration serve to invalidate the school financing system. In addition to the fact that only a minimal amount of State aid is distributed under this category, we cannot say that there is no rational basis for the Legislature’s selection of districts subject to these impacts as those for whom alleviating relief is appropriate and for its provision for such relief so long as the *47 relief is uniformly available to school districts falling within the classifications.
As to the interveners, their contentions that they are denied equal protection under the State Constitution must be rejected for the same reasons that their comparable claims under the Federal Constitution are rejected (supra, at pp 41-42).
Finally, we consider the claim, upheld by all the Judges below, that the present school financing system violates the education article (art XI, § 1) of our State Constitution. It is there required that “[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.”
It is significant that this constitutional language — adopted in 1894 at a time when there were more than 11,000 local school districts in the State, with varying amounts of property wealth offering disparate educational opportunities — makes no reference to any requirement that the education to be made available be equal or substantially equivalent in every district. Nor is there any provision either that districts choosing to provide opportunities beyond those that other districts might elect or be able to offer be foreclosed from doing so, or that local control of education, to the extent that a more extensive program were locally desired and provided, be abolished. What appears to have been contemplated when the education article was adopted at the 1894 Constitutional Convention was a State-wide system assuring minimal acceptable facilities and services in contrast to the unsystematized delivery of instruction then in existence within the State. Nothing in the contemporaneous documentary evidence compels the conclusion that what was intended was a system assuring that all educational facilities and services would be equal throughout the State.[6] The enactment *48 mandated only that the Legislature provide for maintenance and support of a system of free schools in order that an education might be available to all the State’s children.[7] There is, of course, a system of free schools in the State of New York. The Legislature has made prescriptions (or in some instances provided means by which prescriptions may be made) with reference to the minimum number of days of school attendance, required courses, textbooks, qualifications of teachers and of certain nonteaching personnel, pupil transportation, and other matters. If what is made available by this system (which is what is to be maintained and supported) may properly be said to constitute an education, the constitutional mandate is satisfied.
Interpreting the term education, as we do, to connote a sound basic education, we have no difficulty in determining that the constitutional requirement is being met in tiiis State, in which it is said without contradiction that the average per pupil expenditure exceeds that in all other States but two. There can be no dispute that New York has long been regarded as a leader in free public education. Because decisions as to how public funds will be allocated among the several services for which by constitutional imperative the Legislature is required to make provision are matters peculiarly appropriate for formulation by the legislative body (reflective of and responsive as it is to the public will), we would be reluctant to override those decisions by mandating an even higher priority for education in the absence, possibly, of gross and glaring inadequacy — *49 something not shown to exist in consequence of the present school financing system.[8]
For the reasons stated,[9] the order of the Appellate Division should be modified, without costs, to direct that the judgment of Supreme Court be modified by substituting for *50 the declarations that the State’s school financing system violates the equal protection clause and the education article of the State Constitution a declaration that the present statutory provisions for allocation of State aid to local school districts for the maintenance and support of elementary and secondary public education are not violative of either Federal or State Constitution.

. Briefs amici curiae have been filed. In support of the contentions of the original plaintiffs and the intervenors: a brief for the Public Education Association, the Educational Priorities Panel, the New York Civil Liberties Union, and the City Club of New York, and a brief for the Council of Churches of the City of New York, the Department of Education of the Diocese of Brooklyn, the NAACP Legal Defense and Educational Fund, Inc., and the New York Metropolitan Council of the American Jewish Congress. In support of the position of defendants: a brief on behalf of 85 school districts within the State of New York and a brief for the majority leader in the State Senate.

. For the year 1981-1982 there was expended $9.6 billion for public elementary and secondary education, $4 billion of State aid (the largest single item in the State budget) and $5.6 billion raised by local taxes.

. We are assuming that there is a significant correlation between amounts of money expended and the quality and quantity of educational opportunity provided.

. Although worded in terms of a challenge to the State’s system for financing public education including both financial support generated by real property taxation within the local district and that received from the State in the form of State aid, we interpret the assault to be primarily focused on asserted constitutional infirmities in the provisions for State aid. No argument is advanced, for instance, that the Legislature should realign local school district boundaries to assure property-equal districts or that some other revenue-generating means should be substituted for local district real property taxation. Indeed, we have some doubt as to the jurisprudential prudence (assuming that our court would have jurisdiction to do so) of issuing any blanket declaration of unconstitutionality as to the entire system for financing public education, composed as it is of a combination of local and State-wide factors, economic and political — if for no reason other than the great difficulty of fashioning practical remedies or of implementing any such declaration. (Cf. Jones v Beame, 45 NY2d 402, 406, 408-409; Matter of Abrams v New York City Tr. Auth., 39 NY2d 990, 992.) Challenges to the provisions *40 made by the Legislature for appropriation and allocation of State aid to local school districts in the light of the present geographical boundaries of such districts fixed by legislative action and of legislative authorization for local district real property taxation, do present justiciable issues which call for judicial resolution.

. The inclusion in our State Constitution of a declaration of the Legislature’s obligation to maintain and support an educational system is not to be accorded the same significance for purposes of equal protection analysis as would a counterpart reference to education in the Federal Constitution. The two documents are drafted from "discretely different constitutional perspectives. The Federal Constitution is one of delegated powers and specified authority; all powers not delegated to the United States or prohibited to the States are reserved to the States or to the people (US Const, 10th Arndt). Great significance accordingly is properly attached to rights guaranteed and interests protected by express provision of the Federal Constitution. By contrast, because it is not required that our State Constitution contain a complete declaration of all powers and authority of the State, the references which do appear touch on subjects and concerns with less attention to any hierarchy of values, and the document concededly contains references to matters which could as well have been left to statutory articulation (e.g., provision for superintendence and repair of canals, art XV, § 3, scarcely to be classified a fundamental constitutional right on any view).

. (1894 NY Constitutional Convention Documents, Doc No. 62.) Reports by State School Superintendents and Messages by Governors to the Legislature before and after the Constitutional Convention of 1894 with recommendations relative to legislative enactments with respect to the State’s educational system, while informative, are *48 nevertheless irrelevant to an interpretation of the language of the constitutional enactment (e.g., 1877 NY Assem Doc No. 11; 1889 NY Assem Doc No. 7; 1894 NY Assem Doc No. 42; 1895 NY Assem Doc No. 34; 1897 NY Assem Doc No. 71; 1898 NY Assem Doc No. 64; 5 Lincoln, Messages from the Governors, p 852; 9 Lincoln, pp 15-16, 549). What was then, and what over the years since, has been urged on the Legislature as sound educational policy is to be clearly distinguished from the command laid on the Legislature by the Constitution.

. We observe that in the constitutional prescription the connotation of “system” is attached to education — “a system-of free common schools” — not to maintenance and support. Thus, once it is concluded that there is an educational system in New York State which comports with the constitutional requirement, it is immaterial that the Legislature in its wisdom has seen fit to provide financial support under complex formulas with a variety of components, even were it to be concluded that the maze of financial support measures was not entitled itself to be characterized as a “system”.

. Decisions in other jurisdictions upholding existing State school financing systems against claims of violation of equal protection clauses or education provisions of State Constitutions or both include the following (the educational requirement of the State Constitution, when considered, is quoted with the citation): Lujan v Colorado State Bd. of Educ. (649 P2d 1005 [Col] [“a thorough and uniform system of free schools”]); McDaniel v Thomas (248 Ga 632 [“an adequate education for the citizens of Georgia”]); Board of Educ. v Walter (58 Ohio St 2d 368, cert den 444 US 1015 [“a thorough and efficient system of common schools”]); Olsen v State ex rel. Johnson (276 Ore 9 [“a uniform, and general system of Common schools”]); Thompson v Engelking (96 Idaho 793 [“a general, uniform and thorough system of public, free common schools”]); State ex rel. Woodahl v Straub (520 P2d 776 [Mont]); Shofstall v Hollins (110 Ariz 88 [“a general and uniform public school system”]).
Among those cases sustaining one or both of such challenges are Washakie County School Dist. No. 1 v Herschler (606 P2d 310 [Wyo] [denial of equal protection]); Horton v Meskill (172 Conn 615 [denial of equal protection and violation of constitutional article, “free public elementary and secondary schools”]); Serrano v. Priest (5 Cal 3d 584 [denial of equal protection]); Robinson v Cahill (62 NJ 473, cert den sub nom. Dickey v Robinson, 414 US 976 [denial of equal protection and violation of constitutional article, “a thorough and efficient system of free public schools”]).

. The dissent illustrates the very great, and perhaps understandable, temptation to yield to a result-oriented resolution of this litigation. Universal acceptance of the central role of education in our society today is unquestioned.
The dissenter, however, misapprehends the issue before us on this appeal. It is not whether education is of primary rank in our heirarchy of societal values; all recognize and support the principle that it is. It is not whether there are great and disabling and handicapping disparities in educational opportunities across our State, centered particularly in our metropolitan areas; many recognize and decry this state of affairs. The ultimate issue before us is a disciplined perception of the proper role of the courts in the resolution of our State’s educational problems, and to that end, more specifically, judicial discernment of the reach of the mandates of our State Constitution in this regard. The expostulation of the dissenter, and the urgings of those who would alleviate the existing disparities of educational opportunity, are properly to be addressed to the Legislature for its consideration and weighing in the discharge of its obligation to provide for the maintenance and support of our State’s educational system. Primary responsibility for the provision of fair and equitable educational opportunity within the financial capabilities of our State’s taxpayers unquestionably rests with that branch of our government.
As we wrote in Montgomery v Daniels (38 NY2d 41, 53, supra): “It is not our office to rejoice or to lament. A fair regard for the basic polity of separation of powers dictates judicial respect for the proper role of the legislative branch, and pride in the uniquely and essentially neutral role of the judicial branch. That judicial role is both a privilege and a limitation.” It would neither serve the purposes of orderly government nor honor the role of the judiciary to lay aside standards of judicial review recently held appropriate (in decisions in which the dissenter joined) because in this instance corrective measures may, in the view of many, be much needed with respect to the provision of financial support for our educational system.