Smith, J.
(dissenting in part). I agree with and join the majority opinion in upholding the causes of action based on the Education Article of the New York State Constitution and on a violation of title Vi’s regulations. I conclude, in addition, that the complaint states a valid equal protection claim under both the Federal and State Constitutions. I would, therefore, reverse this aspect of the Appellate Division decision and deny the motion to dismiss the equal protection claims.
Judge Ciparick agrees only that plaintiffs have made a valid State equal protection claim.
THE FEDERAL EQUAL PROTECTION CLAIM
Introduction
The present case should be viewed in its historical context. At least since the latter part of the nineteenth century, African-Americans in New York State have sought equality of education. Like many other parts of the Nation, New York segregated its schools on the basis of race. The end of segregation by law did not end efforts to exclude African-Americans *345 from equal educational opportunities. Much of the twentieth century has been spent by African-American parents and students fighting for equality of education.
Plaintiffs have a right to demonstrate that they are receiving less than a minimal basic education. The Equal Protection Clauses of both the Federal and State Constitutions stand for the proposition that State action, through selective and biased funding, cannot be used to condemn African-American, Latino or other children to an education which is inherently inferior.
While the thrust of the decision in Brown v Board of Educ. (347 US 483) was that separate facilities, no matter how similar in terms of resources, were inherently unequal, one underlying fact in those cases was that the resources of the separate schools were unequal. And that fact led to the argument of a denial of equal protection.
The Historical Setting
New York State, like many other States, had a history of segregated schools required by law. In 1864, New York State enacted the "Common School Act” (L 1864, ch 555, tit 10, § 1), which authorized school authorities in cities and incorporated villages to establish separate schools for the education of the "colored” race. This Act empowered school authorities to establish schools for the exclusive use of colored children and authorized such authorities to exclude colored children from schools provided for white children. In 1873, the State enacted the Civil Rights Act (L 1873, ch 186) providing that persons of color shall have full and equal enjoyment of any accommodation, advantage, facility or privilege furnished by teachers and other officers of common schools and public institutions of learning.
Chapter 556 of the Laws of 1894 (art 11, tit 15, §§ 28-30), again provided for the organization and creation of separate schools for colored children in cities, villages, union districts and school districts organized under a special act. The language of section 31 of that same article provided that colored schools in the City of New York "shall be open for the education of pupils for whom admission is sought, without regard to race or color.”
Chapter 492 (§ 1) of the Laws of 1900 expressly provided that "[n]o person shall be refused admission into or be excluded from any public school in the state of New York on account of race or color.” Further, section 2 of that chapter repealed section 28 (art 11, tit 15) of chapter 556 of the Laws *346 of 1894 regarding the establishment of separate schools with equal facilities for colored children in any city or incorporated village.
Under chapter 140 of the Laws of 1910, section 920 of the Education Law provided that "no person shall be refused admission into or be excluded from any public school in the state of New York on account of race or color.” However, section 921 of that same chapter again expressly provided for separate schools for colored children should the inhabitants of any district determine. This apparent inconsistency in the law, of generally prohibiting exclusion from public schools on account of race, but expressly making available the option to establish separate schools, permitted the continuance of segregated schools by law. The gravamen of such disparity resulted in the disparate impact upon the education of children, detrimentally and adversely affecting children of color.
. Such dissimilar treatment in education of children was supported by decisions of this Court. People ex rel. King v Gallagher (93 NY 438 [1883]) involved the denial of admission of a 12-year-old black girl to a local public school in Brooklyn because of her race. The majority affirmed the lower court’s denial of admission to the school because the school was open only to white children. The Court determined that the principal of the school, as administrator, was within his discretion to deny the child admission because she was black. Citing the Common School Act of 1864, which authorized the establishment of separate schools for the education of the colored race within the State, the Court held that such separate schools were not an abrogation of the Privileges and Immunities Clause of the Fourteenth Amendment of the United States Constitution. No impairment was found by the City of Brooklyn requiring separate but equal educational facilities. The Court further determined that notwithstanding the Civil Rights Act of 1873 (L 1873, ch 186), repealing and annulling any statute which discriminated against persons of color (93 NY, at 456), the establishment of separate schools for black and white children was not discriminatory. Judge Danforth dissented, finding the requirement that black children attend schools designated only for black children was unequal and in violation of the laws protecting equal rights.
Further, in People ex rel. Cisco v School Bd. (161 NY 598 [1900]), this Court similarly held that the School Board of Queens was authorized to maintain separate schools for the education of "colored” children and to exclude such children *347 from schools designated for "white” children only. Citing its earlier holding in Gallagher (supra) the Court reasoned that the' Civil Rights Act of 1873 required that equal school facilities and accommodations be furnished, not equal social opportunities.
With the passage of legislation prohibiting the exclusion of blacks from schools on the basis of race, the official policy of the State became one of nondiscrimination against black children. Nevertheless, as several cases have shown, the efforts of some governmental officials have continued the previous State policy of racial exclusion. Thus, over the years, a number of lawsuits have been brought to eliminate the exclusion of blacks from white schools (see, for example, Taylor v Board of Educ., 191 F Supp 181, 195 F Supp 231, affd 294 F2d 36, cert denied 368 US 940, decree mod 221 F Supp 275; United States v Yonkers Bd. of Educ., 837 F2d 1181; Hart v Community School Bd. of Educ., 512 F2d 37).
While the major thrust of efforts to fight unequal treatment of black students has been desegregation, at the same time black parents and pupils have insisted that the facilities and opportunities available to black students have been grossly inferior to those available to white students and have challenged that state of affairs on equal protection grounds. Thus, Brown v Board of Educ. (347 US 483, supra) was clearly decided on the assumption that facilities and other tangible factors of segregated schools were equal even though it was clear that in many instances, the segregated schools were unequal. The Court stated:
"We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible’ factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does.” (347 US, at 493.)
Despite this assumption by the Supreme Court in Brown, at least two of the complaints in the five cases decided there attacked the inequality in black schools when compared to white schools. The allegations of inadequate education made against the State here are similar to claims of inadequacy made in Brown. To the extent that such claims are alleged to be based upon the deliberate action of the State, plaintiffs should be given the opportunity to prove their assertions.
*348 In their complaint in Brown, plaintiffs questioned "whether the denial to infant plaintiffs, solely because of race, of educational opportunities equal to those afforded white children was in contravention of the Fourteenth Amendment of the United States Constitution as being a denial of the equal protection of the laws.” In Briggs v Elliott, another case reversed in Brown, the plaintiffs similarly alleged in their complaint that the "public schools of Clarendon County, South Carolina set apart for white students and from which all Negro students are excluded were superior in plant, equipment, curricula, and in all other material respects to the schools set apart for Negro students.” Plaintiffs argued further that "the defendants by enforcing the provision of the Constitution and laws of South Carolina excluded all Negro students from the 'white’ public schools and thereby deprived plaintiffs and others on whose behalf the action is brought solely because of race and color, of the opportunity of attending the only public schools in Clarendon County where they can obtain an education equal to that offered all qualified students who are not of Negro descent” (see also, Davis v County School Bd., 103 F Supp 337, 340-341).
In Gebhart v Belton (32 Del Ch 343, 87 A2d 862), another case decided in Brown, the plaintiffs, elementary and high school Negro children,[1] brought an action in the Delaware Court of Chancery seeking to enjoin enforcement of provisions of that State’s constitutional and statutory code requiring segregation in the public schools. The court found for the plaintiffs and ordered the immediate admission of the Negro children into schools that were formerly for white children only. The court determined that the separate educational facilities were inherently unequal, finding the white schools superior to the Negro schools with respect to pupil-teacher ratio, physical plants, teacher training, aesthetic considerations, extracurricular activities, and time and distance involved in the student’s travel to and from school. The court concluded that the State, through its agencies, had violated the plaintiffs’ rights under the Equal Protection Clause of the Fourteenth Amendment, by pursuing a policy of segregation in education which resulted in Negro children, as a class, receiving educational opportunities substantially inferior to those available to white children otherwise similarly situated.
The plaintiffs in the New Rochelle school case also alleged a disparity in the quality of education available to black and *349 white students.[1] The court found it unnecessary to consider those claims in the light of Brown.
The Present Allegations and Federal Law
One of the major issues here is what level of scrutiny the courts must give to the plaintiffs’ equal protection claims— minimal or rational basis, intermediate or strict. The minimal level of scrutiny tests whether a classification or statute "bears some fair relationship to a legitimate public purpose” (Plyler v Doe, 457 US 202, 216 [1982]; see also, Alevy v Downstate Med. Ctr., 39 NY2d 326, 332). This standard has often been applied in cases dealing with economics and social welfare (id.). Strict scrutiny applies where a law operates to the disadvantage of a suspect class, or a fundamental constitutional interest is alleged to have been violated (Plyler v Doe, supra, at 216-217; San Antonio School Dist. v Rodriguez, 411 US 1, 18-44; Alevy v Downstate Med. Ctr., supra, at 332). An intermediate level of scrutiny has been applied to legislative classifications which are not "facially invidious” which, nevertheless, "give rise to recurring constitutional difficulties” and require "the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State.” (Plyler v Doe, supra, at 217-218; Alevy v Downstate Med. Ctr., supra.) Plaintiffs assert that intermediate scrutiny should be the standard used here. I conclude that the facts alleged require at least a standard of intermediate scrutiny.
Defendants rely essentially on three cases in concluding that the Equal Protection Clause of the Fourteenth Amendment is not violated — (1) San Antonio School Dist. v Rodriguez (supra), (2) Plyler v Doe (supra) and (3) Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27 [1982]) (hereinafter Levittown).
Plaintiffs’ basic contention, distinguishing this case from Rodriguez and Levittown, is the assertion that the pupils in question are not receiving a minimal basic education sufficient to prepare them for contemporary society including, but not limited to, basic literacy, calculating and verbal skills. If such allegations can be proved and it can further be shown that (1) the property tax funding of schools and or (2) the State allocation of its resources is discriminatory, plaintiffs may be *350 entitled to a decision in their favor, in my view, on Federal equal protection grounds as well as on the Education Article ground which a majority of the Court upholds.
In the complaint here, plaintiffs allege that they are not receiving a minimal basic education as the result of the funding system in the State and further buttress that claim with specific allegations. In addition, the complaint addresses the disparate impact of the funding system on minorities.
It is clear that the Supreme Court has not decided the issue raised here, that a minimal basic education is fundamental and should receive heightened scrutiny. The Court noted such in Papasan v Allain (478 US 265), where it stated:
"The complaint in this case asserted not simply that the petitioners had been denied their right to a minimally adequate education but also that such a right was fundamental and that because that right had been infringed the State’s action here should be reviewed under strict scrutiny. App. 20. As Rodriguez and Plyler indicate, this Court has not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review.” (478 US, at 285 [emphasis supplied].)
The Rodriguez case also does not preclude the claims made here. In Rodriguez, the Supreme Court held that the Texas system of funding education did not violate the Equal Protection Clause of the Fourteenth Amendment. There, Mexican-American parents brought a class action attacking the funding of the Texas educational system. One main difference between that case and this is that Rodriguez involved no allegation that the education of the children was inadequate.[2]
*351 A second point in Rodriguez was that there was no showing that the Texas system of financing schools operated to the disadvantage of a suspect class. If it did, the Court noted, the financing scheme would come under strict scrutiny. Instead, the Court concluded that rational basis was the appropriate test. The Court stated:
"This, then, establishes the framework for our analysis. We must decide, first, whether the Texas system of financing public education operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. If so, the judgment of the District Court should be affirmed. If not, the Texas scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. ” (411 US, at 17 [emphasis supplied].)
In Plyler, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment was violated by denying children of illegal aliens a basic education.[3] While the Court found in Plyler that there was no fundamental right to an *352 education, it applied an intermediate level of scrutiny and held that where a discrete group (children of illegal aliens) was being denied the right to an education, the State had to show a compelling State interest. The Court stated:
"If the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest. No such showing was made here.” (457 US, at 230.)
To prove a violation of the Equal Protection Clause of the Fourteenth Amendment, the plaintiffs must prove intentional discrimination. This intent does not have to be overt and express. It is clear that the complaint alleges that the educational funding by the State has a disparate impact on minority students. The complaint also sufficiently alleges intentional discrimination.[4] After addressing the disparities and inequalities of education for minority students, the complaint states the following:
"76. Over the past ten years, despite knowledge of the facts set forth in the preceding paragraphs, and despite recommendations for major reforms in official reports issued by commissions created by the defendants themselves, the defendants have reenacted the inequitable state aid scheme without substantial modification to address the blatant inequities and their disproportionate impact on minority students, or to ensure that all students throughout the state of New York have available to them the resources necessary to obtain an edu *353 cation meeting or exceeding the Regents’ minimum statewide standards. Defendants have refused to act, even though the detrimental impact of their failure to provide equitable levels of funding on minority students was well-recognized and reasonably foreseeable.”
It is also important to note that intent need not be shown on the face of legislation and that disparate impact is only one of the factors by which intent is shown. This is clear in quotations from both Washington v Davis (426 US 229 [1976]) and Arlington Hgts. v Metropolitan Hous. Dev. Corp. (429 US 252 [1977]). In Washington v Davis the Supreme Court stated:
"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. Bolling v Sharpe, 347 US 497 (1954). But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact * * *.
"This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law’s disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race * * *.
"Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact — in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires — may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimina *354 tian is very difficult to explain on nonracial grounds. Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, McLaughlin v Florida, 379 US 184 (1964), that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.” (426 US, at 239, 241-242.)
In Arlington Hgts. (429 US, at 264-268), the Court stressed factors which indicate circumstantial and direct evidence of intent, including, whether the action bears more heavily on one race than another, a clear pattern, historical background, a sequence of events, statements of members of the decision-making body, minutes, and testimony of officials. Where the ultimate proof shows intentional discrimination through historical background, a pattern, disparate impact or other factors, plaintiffs would be entitled to relief.[5]
The Levittown Decision
In Levittown, this Court relied on the Rodriguez decision in applying a minimal or rational basis standard of review and in rejecting the claims of the plaintiffs that the Equal Protection Clause of the Fourteenth Amendment had been violated. Moreover, in Levittown, this Court noted the absence of any allegation that educational facilities or services fell below the minimum standard set by the Board of Regents. This Court stated:
"No claim is advanced in this case, however, by either the original plaintiffs or the intervenors that the educational facilities or services provided in the school districts that they represent fall below the State-wide minimum standard of educa *355 tional quality and quantity fixed by the Board of Regents; their attack is directed at the existing disparities in financial resources which lead to educational unevenness above that minimum standard.” (57 NY2d, at 38.)
The difference between this case and Levittown is clear. In Levittown, there was no allegation that African-American, Latino or other students were receiving an education which was below the minimum standard. Here, the allegation of the lack of a minimal basic education is at the heart of the action as to all City public school students and that is why a majority upholds the Education Article cause of action.
In sum, I conclude that the plaintiffs have adequately stated a claim under the Equal Protection Clause of the Fourteenth Amendment. I also conclude that this Court is free to adopt a heightened scrutiny standard in dealing with the allegations of denial of a basic minimal education.
THE STATE EQUAL PROTECTION CLAIM
A.
Judge Ciparick and I conclude that the plaintiffs have stated a valid State equal protection claim. New York’s historical and constitutional commitment to public education establishes education as an integral and substantial right of every citizen in our State, and a heightened level of scrutiny should be applied to review the current system of financing public education. In the procedural posture of this case, the allegations of the amended complaint are sufficient to allege that plaintiffs’ equal protection rights, guaranteed by article I, § 11 of the New York State Constitution, have been violated by the State’s funding methodology which denies New York City public school students a minimum adequate education. Therefore, for the current educational aid scheme to withstand intermediate review, defendants must demonstrate that the State’s method of funding public education is substantially related to the important educational needs of its public school students.
While Judge Ciparick and I recognize that the distribution of educational aid is traditionally the bastion of the Legislature, we cannot overlook the allegations of the deleterious consequences of years of inequitable funding which have led to inadequate and substandard educational services. The alie *356 gation is that a substantial number of New York City public school students do not receive the type of basic education necessary to equip them to exercise all of their established rights under the Federal and State Constitutions and to adequately function in society. In the 13 years since this Court’s decision in Levittown» the gross disparities presaged by the Levittown majority are, allegedly, now a reality,[6] and, plaintiffs argue, it is painfully apparent that the Legislature refuses to address what has evolved into an epic constitutional problem,[7] rendering the application of heightened scrutiny particularly appropriate in this case (see, San Antonio School Dist. v Rodriguez, 411 US, at 99, 108 [Marshall, J., dissenting], supra; Dandridge v Williams, 397 US 471, 519-521 [Marshall, J., dissenting], reh denied 398 US 914; Bismarck Pub. School Dist. No. 1 v State of North Dakota, 511 NW2d 247, 259; Hubsch, The Emerging Right to Education Under State Constitutional Law, 65 Temp L Rev 1325 [1992]; accord, Levittown, 57 NY2d, at 39, supra; but see, Levittown, 57 NY2d, at 50, n 9, supra).
Assuming the truth of plaintiffs’ allegations that New York City public school students are receiving an education below minimum standards because of an educational aid scheme that disparately impacts minority students through an inequi *357 table distribution of public moneys,[8] the focus of the inquiry of our dissent in this aspect of the case is whether New York’s funding scheme which includes direct State funding and property-based funding furthers a substantial or important State interest to justify the discriminatory effects. It is alleged that the disparities in educational opportunities for urban public school children are a reality because the State’s method of distributing aid bears no relationship, substantial or rational, to the educational needs of students or the costs of educating students in a particular district.
Since the State is constitutionally charged with providing an educational system that offers "a sound basic education” (Levittown, 57 NY2d, at 48, supra; NY Const, art XI, § 1), the failure to adequately fund New York City schools allegedly denies New York City public school students equal protection of the laws of this State in contravention of article I, § 11 of the New York State Constitution,[9] by depriving them of equal access to educational opportunities.[10] Under the current financing methodology, the quantum of taxable property in a school district bears an immediate and direct correlation to the student’s access to education. Yet, according to plaintiffs, it is not the existence of disparities among districts that produces the unconstitutional inequity, but the fact that the financing scheme employed by the State to fund the system of free common schools perpetuates profound inequality of educational opportunity. Equal protection "is not addressed to the minimal sufficiency but rather to the unjustifiable inequalities *358 of state action.” (San Antonio School Dist. v Rodriguez, 411 US, at 89 [Marshall, J., dissenting], supra.)
Pointing to Levittown, respondents contend that the disparities in funding among districts is the justifiable consequence of local control,[11] long recognized as the legitimate State interest underlying the complex school aid allocation formula.[12] However, these disparities, it is alleged, directly translate into a constitutionally unacceptable result — disparate and diminished educational opportunities for school children who, to their misfortune, reside in districts penalized under the current school aid allocation formula. It is this result — lesser educational opportunity which denies a sound, basic education, based on wealth discrimination — that allegedly transgresses the Equal Protection Clause of the State Constitution, and would require respondents to demonstrate at trial that the current school funding scheme bears an important and substantial relationship to the State’s interest in preserving the current funding scheme and its rationale, which interest cannot be achieved through a less intrusive alternative (see, e.g., Montgomery v Daniels, 38 NY2d 41, 61; Matter of Lalli, 43 NY2d 65, affd sub nom. Lalli v Lalli, 439 US 259; People v Whidden, 51 NY2d 457, 460; Califano v Webster, 430 US 313, 316-317; Craig v Boren, 429 US 190, 197, reh denied 429 US 1124; Alevy v Downstate Med. Ctr., 39 NY2d 326, 336, supra).
This would be no easy task for respondents, complicated by strongly conflicted viewpoints and policies among the very agents who administer educational policy in New York. The *359 Commissioner of Education and the Board of Regents have characterized the school funding scheme as inequitable, charging that it undermines New York’s educational policies. The Commissioner and Board of Regents have assailed the current financing formula for its arbitrariness, asserting that the current methods for allocating State education aid are ineffective and preclude attainment of proposed educational goals.[13]
Even under the benign gaze of rational review, the discriminatory impact of the current financing scheme on school children who reside in districts unable to commit substantial tax dollars to education, a fact exacerbated under the current school aid allocation formula, if proved, could not rationally be countenanced as furthering a legitimate State interest. Plaintiffs should be given the opportunity to prove their allegations in this aspect of the case as well as the one sustained by a majority of the Court.
Accordingly, I would reinstate the second cause of action alleging a violation of the Equal Protection Clause of the Fourteenth Amendment of the Federal Constitution. Judge Ciparick and I would reinstate the second cause of action insofar as it asserts a violation of the Equal Protection Clause of the State Constitution.
Majority opinion by Judge Ciparick and Judges Simons, Titone, Bellacosa, Smith and Levine concur; Judge Levine concurring in result as to the first cause of action based upon a violation of New York Constitution, article XI, § 1, the Education Article, in a separate opinion; Judge Simons dissenting in part and voting not to reinstate the first cause of *360 action in a separate opinion; Judge Smith dissenting in part and voting to reinstate causes of action on behalf of the municipal plaintiffs as well as the nonmunicipal plaintiffs and to reinstate the second cause of action in its entirety, alleging violations of the Equal Protection Clauses of the Federal and State Constitutions in a separate opinion; and Judge Ciparick dissenting in part and voting to reinstate causes of action on behalf of the municipal plaintiffs as well as the nonmunicipal plaintiffs and to reinstate the second cause of action insofar as it asserts a violation of the Equal Protection Clause of the State Constitution, for reasons stated in Judge Smith’s dissenting-in-part opinion; Chief Judge Kaye taking no part.
Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.

. See, Taylor v Board of Educ., 191 F Supp, at 198, n 4, supra).

. The Court in Rodriguez stated: "Texas asserts that the Minimum Foundation Program provides an 'adequate’ education for all children in the State. By providing 12 years of free public-school education, and by assuring teachers, books, transportation, and operating funds, the Texas Legislature has endeavored to 'guarantee, for the welfare of the state as a whole, that all people shall have at least an adequate program of education. This is what is meant by "A Minimum Foundation Program of Education.” ’ The State repeatedly asserted in its briefs in this Court that it has fulfilled this desire and that it now assures 'every child in every school district an adequate education. ’ No proof was offered at trial persuasively discrediting or refuting the State’s assertion.” (411 US, at 24 [emphasis supplied].)
*351 At another point in Rodriguez, the Court stated: "Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short. Whatever merit appellees’ argument might have if a State’s financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where — as is true in the present case — no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process. ” (411 US, at 36-37 [emphasis supplied].)

. In speaking of the effect of the denial of a basic education, the Court stated: "These well-settled principles allow us to determine the proper level of deference to be afforded § 21.031. Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.’ Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population. See San Antonio Independent School Disk v. Rodriguez, supra, at 28-39. But more is involved in these cases than the abstract question whether § 21.031 discriminates against a suspect class, or whether education is a fundamental right. *352 Section 21.031 imposes a lifetime hardship on a discrete class of children not accountable for their disabling status. The stigma of illiteracy will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation. In determining the rationality of § 21.031, we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in § 21.031 can hardly be considered rational unless it furthers some substantial goal of the State.” (457 US, at 223-224.)

. It should be noted that the plaintiffs in CFE assert that they are not alleging the intentional discrimination that would require strict scrutiny. I read that statement to mean that they are not alleging overt, express discrimination.

. In his concurrence in Washington v Davis, Justice Stevens noted that the line between purposeful discrimination and disparate impact was not always bright, and, in some instances, where the disproportionate impact is great, the difference between purpose and effect would be "irrelevant” (426 US, at 253-254).

. Scholarly commentary has long criticized the inadequate educational services the inequitable distribution of resources has established as a legacy in urban centers in this State. The amici refer to the 1993 findings of the Swygert Commission which report that New York has created a dual system of education (see, brief of amici curiae, American Civil Liberties Union et al., at 2, citing Swygert, Putting Children First, New York State Special Commission on Educational Structures, Policies and Practices [1993]). It should come as no surprise that the austere fiscal policies of the past decade have only exacerbated the inequities wrought by the school funding scheme (see, Newman, Essentials Become Luxuries as Schools Cope with Budget Cuts, New York Times, Jan. 16,1995, at B1, col 2).

. Plaintiffs allege that "[o]ver the past ten years, despite knowledge of the [gross disparities and glaring inadequacies], and despite recommendations for major reforms in official reports issued by commissions created by the defendants themselves, the defendants have re-enacted the inequitable state aid scheme without substantial modification to address the blatant inequities and their disproportionate impact on minority students, or to ensure that all students throughout the state of New York have available to them the resources necessary to obtain an education meeting or exceeding the Regents’ minimum statewide standards. Defendants have refused to act, even though the detrimental impact of their failure to provide equitable levels of funding [to] minority students was well-recognized and reasonably foreseeable.”

. Plaintiffs allege that approximately 74% of the minority public school population attend school in New York City and that minorities comprise 81% of the City’s public school enrollment, compared with 17% in public schools outside New York City (record on appeal, at 71-72). Plaintiffs assert that educational services provided in New York City public schools fall below Regents’ standards (record on appeal, at 72), and that New York City public school minority students receive below average scores on State-wide achievement tests in numbers disproportionate to nonminority students (id.). Therefore, plaintiffs charge that there is a racial dimension to this State’s public school funding policy which impermissibly disadvantages minority students.

. The equal protection prong of this provision provides that "No person shall be denied the equal protection of the laws of this state or any subdivision thereof.”

. Short of a fundamental right, education has nevertheless been hailed as "perhaps the most important function of state and local governments” (Brown v Board ofEduc., 347 US 483, 493, supra), and that "New York has long been regarded as a leader in free public education” (Levittown, 57 NY2d, at 48, supra).

. In rejecting the State’s contention that local independence of choice is supported by the current educational funding scheme, Justice Lazer observed: "[T]he quality of the educational opportunity offered by any particular district is largely determined by the amount of taxable property in the district. For the property-poor, local control of education is more illusory than real, for it cannot be utilized to produce the educational output local authorities perceive as appropriate but only what a limited local tax base will permit. * * * '[a] general policy of local control affords no real justification for maintaining a school finance ghetto’ (Carrington, Financing the American Dream: Equality and School Taxes, 73 Col L Rev 1227, 1259)” (Levittown, 83 AD2d 217, 243).

. Plaintiffs characterize defendants’ methodology for allocating State education aid as "an incoherent, unsystematic aggregation of 50 different formulas, categorical program fundings, flat grants, minimum aid ratios, caps, hold harmless guarantees and other inconsistent provisions which have emerged from decades of political compromises based on considerations unrelated to educational need or any principles of equity,” that are inevitably renegotiated every year depending on the political winds (see, record on appeal, at 58, amended complaint f 25).

. The Commissioner and Board of Regents have specifically discredited the current financing scheme because its formulation
"a. do[es] not provide adequately for all students, especially the most needy;
"b. [is] unduly complicated, with 53 separate formulas governing the distribution of aid;
"c. inhibit[s] local flexibility, since many kinds of aid require specific programs whether or not such programs are the best use of the money;
”d. entail[s] no accountability for results, because districts continue to receive the money no matter what;
"e. do[es] not deal adequately with local differences in wealth and cost;
"f. do[es] not adequately support needed improvements in teaching and learning * * *
"g. do[es] not foster interagency collaboration, since funds are allocated agency by agency, and rules for their distribution are separately defined;
"h. lack[s] public credibility, for all of these reasons” (record on appeal, at 59-60).