OPINION OF THE COURT
John J. Ark, J.
Preamble
One cannot overstate either the disturbing circumstance of the Rochester City School District or its pivotal importance to our community. Without a vital education system, the City of Rochester withers and our county is very much diminished. However, the court’s role is neither to set nor change education policy, but to remedy, where necessary and possible, deprived constitutional or statutory rights. Accordingly, the court will address two issues. First, have the plaintiffs articulated a violated constitutional or statutory right? And if so, can the court fashion a remedy?
Statement of Facts
Plaintiffs, a group of disadvantaged and minority students in the Rochester City School District (hereinafter RCSD), filed this proposed class action in September 1998 on behalf of the 37,000 students in the RCSD against the State of New York, various State agencies and officers (hereinafter collectively the State), claiming that the combination of poverty and racial isolation in the RCSD makes it impossible for students in that district to receive a sound basic education as required under article XI, § 1 of the New York State Constitution (hereinafter the Education Article). The action also seeks a declaration that the inferior education provided to minority students in the *229 RCSD violates the State Constitution’s Equal Protection Clause, title VI of the Civil Rights Act of 1964 (42 USC § 2000d), and the regulations implementing title VI.
A synopsis of the plaintiffs’ allegations follows.
Based almost exclusively on data provided by the State, by virtually every measure of educational outcomes, RCSD students fall far below students in the other school districts in Monroe County, and are, by any standard, inadequate.
Approximately 90% of RCSD students are poor, as measured by their eligibility for Federal free and reduced price lunch programs. The percentage of poor students in the other school districts in the county is approximately 16%. The inadequacy and disparity in educational outcomes are due largely to the very high concentration of poor students in the RCSD, as compared to the concentration of poor students in the other Monroe County school districts.
The RCSD’s high poverty concentration is highly correlated with the concentration of racial minorities. African-Americans and Latinos comprise approximately 80% of the students within the RCSD. By contrast, African-American and Latino students comprise only 9% of the students in the other school districts in the county.
Study after study have concluded that high poverty concentration is the leading cause of inadequate educational achievement.
For years, the State has been fully aware of the increasingly high concentration of poor students in the RCSD and that a high concentration of poor students in schools almost always causes severely depressed, inadequate levels of academic achievement. Despite this awareness, and in the face of its State constitutional obligation to ensure that RCSD students receive a sound basic education, the State has failed to take any meaningful steps to remedy the increasingly high concentration of poor students in the RCSD. Nor has the State taken any other meaningful steps to ameliorate the effects that high concentrations of poor students have on student performance. These failings by the State deprive the plaintiffs of their constitutional right to the sound basic education provided to students in all the other school districts in the county.
It is not only the State’s failure to remedy the concentration of poor students in the RCSD and its effect on students’ performance that deprives them of a sound basic education, but also that the State has enacted and enforced specific policies and *230 practices that have directly caused the concentration of poor students in the RCSD. Among these policies and practices are State school district residency requirements and tuition payment requirements for RCSD students who might want to attend public schools outside the City of Rochester. These actions violate the Equal Protection Clause of the State Constitution (art I, § 11) and title VI of the Civil Rights Act of 1964.
Defendant’s laws, policies and practices, which force plaintiffs to remain in RCSD schools with high poverty concentration, have an adverse discriminatory impact on African-American and Latino students, thereby violating plaintiffs’ rights under the United States Department of Education’s regulations implementing title VI (34 CFR 100.3 [b] [2]), which prohibit State laws, policies and practices that have an adverse discriminatory impact.
In Paynter v State of New York (270 AD2d 819 [4th Dept]), the Appellate Division directed the plaintiffs to join as defendants the school districts located wholly or partly in Monroe County. The second amended complaint, served in April 2000, is the first pleading in this case naming as defendants the RCSD and the suburban school districts in Monroe County and it merely reiterates the initial allegations in the case. It requests injunctive relief against the State and an order that they develop a plan to remedy the educational deficiencies and legal violations described in the second amended complaint.
Discussion
Necessary Parties
“Because this action threatens the very existence of the school districts as they are presently constituted, administered and funded, the school districts are parties ‘who might be inequitably affected by a judgment’ and ‘who ought to be parties if complete relief is to be accorded’ (CPLR 1001 [a])” (Paynter, supra, at 820), the Appellate Division has determined, and this court must follow, that the RCSD and suburban school districts are necessary parties. Accordingly, the plaintiffs named the RCSD and suburban school districts as additional defendants in the caption of the second amended complaint, but expressly state in paragraph 33 on page 5, “Plaintiffs assert no claims against any of these school districts.”
Similarly, in the prayer for relief, the second amended complaint seeks no remedies against the RCSD or any other school *231 district (see, CPLR 3017 [c]; 3013). With no allegations against them, the RCSC and suburban school districts’ motions to dismiss the case against them are granted (see, CPLR 3211 [a] [7]; 3013; Kramer v Loeb, Rhoades & Co., 20 AD2d 634). Furthermore, even though this is a State and not a Federal equal protection claim, since there are no allegations of any wrongdoing by them, let alone interdistrict violations, there can be no interdistrict remedy (see, Milliken v Bradley, 418 US 717; Missouri v Jenkins, 515 US 70).
Education Article
The seminal cases Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27 [hereinafter Levittown]), Reform Educ. Fin. Inequities Today v Cuomo (86 NY2d 279 [hereinafter R.E.F.I.T.]), and Campaign For Fiscal Equity v State of New York (86 NY2d 307 [hereinafter C.F.E.]) hold:
“That [the Education] Article requires the State to offer all children the opportunity of a sound basic education * * * Such an education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury. If the physical facilities and pedagogical services and resources made available under the present system are adequate to provide children with the opportunity to obtain these essential skills, the State will have satisfied its constitutional obligation.” (C.F.E., at 316.)
In Paynter (supra), plaintiffs claim their poor academic performance, and resulting less than a sound basic education, are caused not by disparities in overall funding or inadequacies in physical facilities and pedagogical services but by the State’s role in fostering, and subsequent failing to address, racial and economic isolation between the RCSD and the other Monroe County public schools. Plaintiffs maintain that under the Education Article, district-wide educational outcomes are the touchstone for ascertaining a constitutional violation. Plaintiffs allege that consistent with C.F.E. (supra) a claim under the Education Article is stated when one alleges substandard academic performance in a given district and can point to a systematic cause for that performance. Citing outcome statistics of poor academic performances and high drop-out rates, the plaintiffs demand that the State correct the educational failure imposed by poverty concentration and racial isolation.
*232 Contrariwise, the State, asking for a literal application of C.F.E. (supra), maintains that poor academic outcomes alone are insufficient to establish a claim under the Education Article. Since the plaintiffs have not alleged that inputs, i.e., “minimally acceptable educational services and facilities,” are not being provided in the RCSD, the State asserts the plaintiffs have failed to state a constitutional claim. The State further maintains that as long as “a sound basic education” is being made available to students, a constitutional violation of the Education Article cannot be established by outcome statistics alone.
Satisfaction of the State’s education obligation by providing “adequate physical facilities and pedagogical services and resources” is understandable in the education financing context of Levittown and C.F.E. (supra). Although resulting from racial concentrations, and not from funding disparities, Paynter (supra) is similar to R.E.F.I.T. (supra) and Levittown in that the gist of the complaint is the relative quality of school districts. However, as summarized in R.E.F.I.T. (at 283), the Court of Appeals in Levittown held that the Education Article “does not mandate that all educational facilities and services be substantially equal throughout the State. Rather, article XI, § 1 was intended to require the Legislature to provide a State system of free schools availing all of the State’s children of a ‘sound basic education’ (id., at 48).” In sum, “[t]he Education Article does not by its express terms contain an egalitarian component” (R.E.F.I.T., at 284).
In C.F.E. (supra), the Court has set forth a specific standard (physical facilities and pedagogical services) which, if met, absolves the State of any further responsibility. The C.F.E. plaintiffs alleged a failure on the part of the State to meet this threshold and the Court allowed that case to proceed. By so doing, the Court appears to have, at least in part, equated “the opportunity of a sound basic education” with adequate “physical facilities and pedagogical services and resources.” However, the Court remanded the case back to the trial court “to evaluate whether the children in plaintiffs’ districts are in fact being provided the opportunity to acquire the basic literacy, calculating and verbal skills necessary to enable them to function as civic participants capable of voting and serving as jurors” (C.F.E., at 318).
The Court continued: “We do not attempt to definitively specify what the constitutional concept and mandate of a sound basic education entails. Given the procedural posture of this *233 case, an exhaustive discussion and consideration of the meaning of a ‘sound basic education’ is premature.” (C.F.E., 86 NY2d, supra, at 317.) One could surmise that the C.F.E. Court deferred on the meaning of “a sound basic education.” Particularly since the proof adduced at the subsequent C.F.E. trial concerned both inputs and outcomes, it may well be something either other or more than “physical facilities and pedagogical services and resources.” This may also be indicated by the C.F.E. Court (at 314) referring to “ ‘minimal acceptable facilities and services’ ” or “ ‘a sound basic education’ ” in the alternative. Even so, can the dismal outcomes of the RCSD alone, vis-a-vis the achievement of the other Monroe County schools, be sufficient to establish the predicate for a constitutional violation?
Although less troubling than present, the RCSD outcomes of the 1970’s were before the New York courts in Levittown (supra). Per Judge Fuchsberg’s dissent (57 NY2d, at 54-55), the Levittown Court was aware that:
“ ‘results of national, State and local achievement tests demonstrate that unconscionable numbers of children fail to acquire basic educational skills. In Rochester, standardized tests given in 1975 revealed that 45% of the secondary school students were “educationally disadvantaged” — that is, not performing at grade level and at least two years or more below level in reading — as were 58% of those students in mathematics; 16% of Rochester’s twelfth grade students read fifth grade level or below.’ ”
Furthermore,
“[T]he Court in Levittown not only had before it the contention that disparities in overall funding and quality of education among local school districts violated the Education Article. The Court also undisputedly had before it the claim, supported by findings of fact and conclusions of law by the lower courts, that, irrespective of the existence of disparities, the school children in the plaintiff and intervener school districts in that case were not receiving the educational opportunities guaranteed by the Education Article” (C.F.E., supra, at 328 [Levine, J., concurring]).
More specifically,
“The [Levittown] Appellate Division majority found *234 that the then-current State funding scheme violated the Education Article in failing to provide children in the school districts represented there with the skills required thus ‘to function in society’ (83 AD2d, at 251, supra).” (C.F.E., supra, at 329 [Levine, J., concurring].)
Regardless,
“this Court held, as a matter of law, that the plaintiffs and intervenors in Levittown had not established (indeed, not even claimed) that the State’s public education funding scheme failed to provide the educational opportunity mandated by article XI, § 1, i.e., minimal facilities and services needed for a sound basic education.” (C.F.E., supra, at 329 [Levine, J., concurring].)
Since C.F.E. (supra) holds that an allegation of educational deprivation supported by fact-based claims “that minimally acceptable educational services and facilities are not being provided” will state a cause of action, Judge Levine’s analysis of Levittown (supra) indicates that merely claiming failed academic results vis-a-vis disparities, albeit financial, among school districts, is insufficient to state an Education Article violation. Arguably, without alleging inadequacies in physical facilities, there may not even be a minimal academic threshold which must be attained.
“[A]rticle XI, § 1 does not explicitly designate a State responsibility regarding any minimum quality of education. It expressly imposes only the duty upon the Legislature to ‘provide for the maintenance and support of a system’ of free public education * * * The Levittown Court emphasized that the constitutional mandate is solely to maintain a system of education.” (C.F.E., supra, at 331 [Levine, J., concurring].)
Even more problematic is where the “cited inequalities existing in cities are the product of demographic, economic, and political factors intrinsic to the cities themselves, and cannot be attributed to legislative action or inaction” (Levittown, supra, at 41).
In sum, giving plaintiffs’ submissions the benefit of every favorable inference, by not having alleged that inputs, i.e., “minimally acceptable educational services and facilities,” are not being provided in the RCSD and by only claiming failed academic results vis-a-vis disparities among school districts, the *235 plaintiffs have failed to state a constitutional claim per the Education Article. Accordingly, the defendant’s motion to dismiss the first cause of action of the complaint is granted. The defendant’s motion to dismiss the third cause of action of the complaint is granted in that the third cause of action duplicates either the first or second cause of action or both.
Equal Protection Claim
In C.F.E. (86 NY2d, supra, at 319, 320), the Court states that “education was not a fundamental right” under either the United States (San Antonio Ind. School Dist. v Rodriguez, 411 US 1, reh denied 411 US 959) or State Constitution and that “the rational basis test was the appropriate standard for equal protection analysis under both Constitutions [citing Levittown, at 41-43].” The Court continues (at 321):
“the case law from our Court and the Supreme Court holding that an equal protection cause of action based upon a disproportionate impact upon a suspect class requires establishment of intentional discrimination (see, Arlington Hgts. v Metropolitan Hous. Corp., 429 US 252, 264-265; Washington v Davis, 426 US 229, 240; People v New York City Tr. Auth., 59 NY2d 343, 350, supra; Board of Educ. v Nyquist, 57 NY2d, at 43-44, supra).”
Plaintiffs claim the State’s actions have promoted and perpetuated de jure school segregation through enforcement of school residency laws and shifting low-income housing development from the suburbs to the cities. Ultimately, poverty concentration and its impact on the RCSD may, in part, be shown to be exacerbated by the confluence of Education Law § 3202 (hereinafter section 3202) and section 6265 (5) of McKinney’s Unconsolidated Laws of NY (New York State Urban Development Corporation Act § 15; L 1968, ch 174, § 1, as amended [hereinafter section 6265 (5)]). Thus, the analysis focuses on whether these statutes “were rationally based upon and reasonably related to a legitimate State interest” (C.F.E., supra, at 320).
Section 3202’s preservation and promotion of local control of education has been sanctioned explicitly by the New York Court of Appeals (Levittown, 57 NY2d, supra, at 44; C.F.E., supra, at 320) and implicitly by the United States Supreme Court (Martinez v Bynum, 461 US 321) and is, therefore, unassailable in this case. Section 6265 (5), however, has no such imprimatur.
*236 The New York State Urban Development Corporation (hereinafter UDC) was created in 1968 as a vehicle for planning, financing, constructing and ensuring optimal use of urgently needed industrial, educational, recreational and housing facilities within the State’s impoverished urban centers. UDC was empowered with a near absolute operational autonomy to permit it to deal quickly and efficiently with the plethora of quality of life problems faced by cities throughout the State: physical deterioration, economic stagnation, unemployment, and shortages in adequate housing and civic facilities. The plaintiffs claim that by section 6265 (5)’s repeal of the authority of the UDC to construct low-income housing without approval of municipalities, the State’s major tool to achieve racial and economic desegregation in Rochester was eliminated. The plaintiffs further claim that this repeal was racially motivated.
The defense contends that section 6265 (5) was passed to promote harmonious relations between the UDC and local communities to “greatly enhance the ability of the UDC in solving the desperate housing shortages in our State.” (See, Mem of Assemblyman Suchin, 1973 NY Legis Ann, at 148.)
Although in a different context, as set forth in Elmwood-Utica Houses v Buffalo Sewer Auth. (65 NY2d 489, 495):
“Legislative enactments carry an exceedingly strong presumption of constitutionality, and while this presumption is rebuttable, one undertaking that task carries a heavy burden of demonstrating unconstitutionality beyond a reasonable doubt * * *
“Where a statute is challenged as denying equal protection, and a ‘fundamental interest’ or a ‘suspect’ classification is not involved, the standard by which the classification is measured to determine whether or not it will pass constitutional muster is the ‘reasonable basis’ test. Where the classification has some reasonable basis, it does not offend the Constitution simply because the classification * * * in practice * * * results in some inequality.” (Internal quotations omitted.)
Particularly in the aforementioned Levittown context (at 41) that “the cited inequalities existing in cities are the product of demographic, economic, and political factors intrinsic to the cities themselves, and cannot be attributed to legislative action or inaction,” the plaintiffs have a most difficult burden establishing: (1) that the State’s passage of section 6265 (5) was racially motivated and had a discriminatory intent; (2) that there is a causal relationship between any of the laws at issue and the alleged poverty and racial imbalances affecting *237 the RCSD; and (3) that the cause of the undesirable performance outcomes is enrollment demographics. Regardless, they are to be given the opportunity to develop, if possible, the historical background, the patterns of discriminatory actions and/or inactions and other factors to establish intentional discrimination as it relates to section 6265 (5). Failing which, the second cause of action shall be dismissed.
Title VI of Civil Rights Act
New York State is a recipient of Federal funds for education. Title VI prohibits racial discrimination in programs receiving Federal financial assistance. In C.F.E. (86 NY2d, supra, at 321-322), the Court of Appeals has stated: “The Supreme Court has ruled that there must be a showing of intentional discrimination to succeed on a title VI claim (see, Guardians Assn. v Civil Serv. Commn., 463 US 582) * * * [P]roof of discriminatory intent is required in order to make out a violation of title VI (see, Alexander v Choate, 469 US 287, 293).” The plaintiffs may proceed to establish their claim that the repeal of the authority of the UDC to construct low-income housing without the approval of municipalities was racially motivated and had a discriminatory intent. Failing which, so much of the fourth cause of action as relates to a violation of title VI shall be dismissed.
Implementing Regulations of Title VI of Civil Rights Act
Implicit in C.F.E. (supra) is the Court of Appeals rejection of the State’s contentions: (1) that the title VI regulations are limited to agency enforcement with no private causes of action, and (2) that actions of the State as a whole, or a State Legislature, are not considered to be a “program or activity” subject to the title VI regulations. Noting that the private plaintiff issue is presently before the United States Supreme Court in Sandoval v Hagan (197 F3d 484 [11th Cir]), until the United States Supreme Court decides otherwise, plaintiffs may proceed.
As set forth in C.F.E. (supra, at 323):
“A validly stated cause of action under the title VI regulations thus has two components: ‘whether a challenged practice has a sufficiently adverse racial impact — in other words, whether it falls significantly more harshly on a minority racial group than on the majority — and, if so, whether the practice is nevertheless adequately justified.’ * * *
“Once a prima facie case is established, the burden of persuasion shifts to the defendant to affirmatively defend the chai *238 lenged practice by way of a legitimate nondiscriminatory reason * * * If the defendant meets its burden and demonstrates that the challenged practice is justified or necessary, the plaintiff can still prevail by showing that ‘less discriminatory alternatives’ were available to further the purportedly legitimate interest.”
The plaintiffs have presumptively established that the combined effect of sections 3202 and 6265 (5), which causes plaintiffs to remain in RCSD schools with a high poverty concentration, has an adverse discriminatory impact on African-American and Latino students. Plaintiffs support their allegations statistically, emphasizing the disparity in education results between RCSD students and those in the suburban school districts. The State has presumptively defended the challenged statutes by way of legitimate nondis criminatory reasons. Should section 6265 (5) prove to be discriminatory and not justified or necessary, the articulation of less discriminatory alternative remedies may be deferred. However, should the plaintiffs fail in their proof of discrimination, they will have to set forth their “less discriminatory alternatives.” Defendant’s motion to dismiss the fourth cause of action as relates to the implementing regulations of title VI is denied.
Remedies
Instead of asking that the State present a meaningful proposal, the plaintiffs are deliberately silent on the specifics of remedy. Although not procedurally apropos, the issue of remedies is nevertheless germane. At a minimum, if the plaintiffs are not able to establish discriminatory intent in the enactment of section 6265 (5), they may have to set forth their remedies as “less discriminatory alternatives” pursuant to their title VI implementing regulations claim.
What remedies are available? As set forth above, since there are no allegations of any wrongdoing by the suburban districts, let alone interdistrict violations, there can be no court-imposed interdistrict remedy. Ultimately, as with many public policy issues, funding very much determines solutions. The State must satisfy unlimited needs with limited financial resources. Not only must the RCSD compete with prospering suburban school districts for State education funds, but should the C.F.E. plaintiffs prevail, a reallocation of State education monies to New York City schools could result in less funding for the RCSD, thereby making the RCSD situation even more difficult.
The parties have the same objective: the improvement of education in the RCSD. Thoughtful people can disagree as to *239 the efficacy of particular solutions. For example, remedies such as charter schools and urban-suburban programs that place motivated students outside the RCSD for the purpose of enhancing their achievement reduce the number of better students with whom the remaining RCSD students associate. As a result, the RCSD could be left with the more difficult and expensive children to educate, but with less funding and less of the better students.
Since all the obvious ideas have been tried, a composite of solutions is needed. This court encourages the parties to consider committing their resources to the fashioning and application of remedies, and not to further litigation and a court-mandated solution. Consider the following.
In 1964, only 9.3% of black students in the formerly segregated jurisdictions were attending school with white students. Today, in Monroe County, African-Americans and Latinos comprise only 9% of the students in the suburban school districts. Prior to 1954 and Brown v Board of Educ. (347 US 483), many segregated American public schools were sanctioned by the courts as racially “separate but equal.” But now, when compared to the other school districts in Monroe County, the RCSD is separate but apparently not equal. Nor, as interpreted by the Court of Appeals, is financial equality an objective of New York’s Education Article, which allows for economic disparities among school districts. The plaintiffs have set forth a compelling case that poverty concentration and racial isolation have affected the education provided minority students in the RCSD, as in most American, and certainly New York State, cities, to be inferior to that in surrounding suburban districts.
But the courts realize they are not competent to resolve these most difficult education issues.
“That this Court in Levittown construed the Constitution as imposing only a drastically limited State funding responsibility for guaranteeing the quality of public school education also stems from the Levittown majority’s awareness of the inherent and proper limitations of the courts in enforcing the constitutional obligation. The Levittown decision cogently pointed to the ‘enormous practical and political complexity’ (57 NY2d, at 38, supra) of deciding upon educational objectives and providing funding for them which, under our form of government, are legislative and executive prerogatives upon which courts should be especially hesitant to intrude {id., at 39; see also, id., at 49, n 9).” (C.F.E., 86 NY2d, supra, at 330 [Levine, J., concurring].)
Regardless, should this court find that the State has discriminated against the minority students of the RCSD, the *240 State will be held accountable and a remedy ordered. Otherwise, the education of our children is best left to the executive and legislative branches of the government.