■ JOHN L. METE et al., Appellants, v NEW YORK STATE OF-FICE OF MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES et al., Respondents. [800 NYS2d 161]—

Order, Supreme Court, New York County (Paula J. Omansky, J.), entered on or about January 22, 2004, which, in this class action alleging age discrimination in employment, granted defendants' motion for summary judgment dismissing plaintiffs' first through third causes of action based on the theory of disparate treatment, unanimously affirmed, without costs. Order, same court and Justice, entered October 3, 2002, which granted defendants' motion for summary judgment dismissing plaintiffs' fourth cause of action based on the theory of disparate impact, unanimously affirmed, without costs.

Plaintiffs were employed by defendant New York State Office of Mental Retardation and Development Disabilities (OMRDD) as Chiefs of Developmental Center Treatment Services (Chief or Chief of Service) when that position was eliminated in 1989 pursuant to a reduction in force (RIF). All 46 employees then holding that job title either were demoted, with a corresponding reduction in salary and benefits of approximately $30,000 per year, or retired. At the time, all 46 Chiefs were over the age of 40. While the RIF adversely affected employees in other positions, the Chief title was the only management-level title targeted for total elimination.

To achieve savings of approximately $10 million, the RIF initially targeted 322 employees for termination. Ultimately, however, only 163, including the Chiefs, were affected. Of these, 122, or 74.8%, were over the age of 40. By comparison, only 46.5% of OMRDD's total employee population at the time was over 40. Thus, plaintiffs allege that the RIF constituted disparate treatment of, and had a disparate impact on, OMRDD's managers who were over the age of 40.

In accord with federal standards of recovery under title VII of the Civil Rights Act of 1964 (*see Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997], citing *Texas Dept. of Community*

*Affairs v Burdine*, 450 US 248, 252-253 [1981] and *McDonnell Douglas Corp. v Green*, 411 US 792, 802 [1973]), plaintiffs claiming discrimination under the New York Human Rights Law (Executive Law § 296) bear the initial burden of establishing a prima facie case of discrimination by demonstrating, by a preponderance of the evidence, that they are members of the class protected by the statute, that they were qualified for their positions, and that they were discharged or suffered other adverse employment action under circumstances giving rise to an inference of discrimination (*see Ferrante*, 90 NY2d at 629). It then falls to the defendant to articulate, through the introduction of admissible evidence, a legitimate, nondiscriminatory reason for the adverse action (*id.*), after which the burden shifts back to the plaintiffs to prove that the legitimate reason proffered by the defendant is merely a pretext for discrimination (*id.* at 629-630).

To meet the ultimate burden of proving that intentional discrimination has occurred, the plaintiffs must show both that the defendant's proffered reason was false and that discrimination was the real reason (*id.* at 630). Thus, to withstand a motion for summary judgment, they must show that there is a material issue of fact as to those issues (*id.*).

It is undisputed that plaintiffs established their prima facie case of discrimination; they were members of a class protected under the statute, they were qualified to hold their positions, and they suffered adverse employment action under circumstances giving rise to an inference of discrimination. It is also undisputed that defendants met their burden of articulating a legitimate reason for the elimination of the Chief of Service job title, i.e., that it was part of a reduction in work force prompted by economic conditions (*see Matter of Laverack & Haines v New York State Div. of Human Rights*, 88 NY2d 734, 739 [1996]).

Defendants' evidence established that the Chief position had been under scrutiny since 1980, when OMRDD formed a task force to study the management structures of the Borough and District Disabilities Services Offices (B/DDSO), which operated residential and day programs for developmentally disabled individuals at developmental centers and at community-based sites throughout the state. Defendants' evidence includes the 1981 report of the task force and affidavits of William McChesney, Chief Classification and Pay Analyst in the New York State Department of Civil Service until 1999 and head of the Division of Classification and Compensation unit responsible for all position classification and salary grade allocation actions requested by OMRDD, Arthur Webb, Commissioner of OMRDD

from 1983 to 1990, and Barbara Hawes, Deputy Commissioner for Program Operations in the Central Office of OMRDD during 1989.

One of the aims of the task force study was to develop organizational models designed to strengthen program management and improve the quality of care in the developmental centers by redefining the first-line and service-line staffing structure, which included Chief of Service and Treatment Team Leader positions. The task force reported that the Chief of Service positions "appeared to have inappropriate and inadequate responsibilities, functions and workload for their level of compensation," as evidenced by the Chiefs' involvement in day-to-day management problems and administrative details that could be performed more appropriately by line managers, and that the positions "needed to be redefined to insure the most effective and efficient utilization of management resources in fulfillment of the developmental center mission."

The task force recommended that the Chief position be renamed "Developmental Service Manager" and reallocated from the M-5 to the lower M-3 salary grade, a more appropriate level of compensation relative to management positions immediately above and below in the developmental center hierarchy. Former Chief Classification and Pay Analyst McChesney explained that in the years preceding the 1981 study there had been a steady decline in the developmental center client population, and that the decline continued thereafter, as more individuals were placed, instead of in the developmental centers, in the less restrictive community-based residential and day centers. The result was that a large number of Chief positions were "not performing the functions and activities for which the positions were established."

In 1985, the Chief position was earmarked for elimination; that meant, according to former Deputy Commissioner Hawes, that no vacated Chief position could be filled or used unless it was reclassified to the M-3 level. Former Commissioner Webb explained that although OMRDD could have abolished the position at that time, it chose to reduce the number of Chiefs through attrition. However, "[t]he fiscal crisis of 1989 denied us the luxury of that slower, less onerous method."

Webb stated that the RIF had three general objectives: to streamline OMRDD's organization, to reduce unnecessary positions and functions, and to match available resources with consumer needs. In preparation for the RIF, the Central Office management staff of OMRDD conducted an agency-wide review, assessing staffing level needs compared to census levels and

compatibility of functions with service system needs, and targeted certain institutional positions for elimination, including certain titles such as Chief of Service, Developmental Services Manager, and Teacher. In addition, each Development Disabilities Services Office conducted a review of its own operation and identified positions for elimination. By 1989, the number of residents in OMRDD's institutions had been greatly reduced, and "the overall direction of the agency was to continue to reduce the census in the institutions and eventually operate a completely community based system with all developmental centers closed. The level of middle management provided by the Chief of Service and Developmental Services Manager was therefore no longer needed in the management structure of the development centers."

Webb further stated, "It was an extremely difficult decision to eliminate the title of Chief of Service because of its impact on so many high level managers at OMRDD, but it was the right decision to make for the agency. It was a level of management which we could do without and achieve the fiscal savings which were immediately needed." He added that "[a]ge was never a consideration in my decision since I did not even know the ages of those affected by the decision." Hawes also said that "[a]t no time during any of the discussions concerning the elimination of the title was age ever even raised as a consideration."

Thus, at issue is whether plaintiffs' evidence raises an inference that defendants' proffered reason for the elimination of the Chief title was false and their real reason was discrimination. Plaintiffs argue that defendants' discriminatory intent is demonstrated by the statistical evidence, certain age-biased remarks made by high-ranking OMRDD officials in conversation with former Chiefs, and letters written by State Senators challenging defendants' fiscal concerns. Plaintiffs also contend that the 1981 task force report and the 1985 earmarking do not support OMRDD's asserted justification for eliminating the Chief title.

In addition to the fact that every Chief position was occupied in 1989 by a person over 40 and every Chief position was eliminated, the statistical evidence includes an affidavit of Dr. David F. Greenberg, a New York University professor whose courses include the application of statistics to the study of social phenomena, detailing his analysis of the RIF data. Greenberg found that OMRDD employees who were over the age of 40 were three times more likely to be adversely affected as those under the age of 40. He then analyzed this disparity and concluded that it was statistically significant, i.e., that "it was

extremely unlikely to have arisen by chance or through the use of any age-neutral criterion."

Plaintiffs, all former Chiefs, contend that from the statistics concerning the layoffs of OMRDD's non-Chiefs brought about by the RIF, an inference can be drawn that the general age animus that pervaded the RIF likely infected the specific decision to eliminate the Chiefs. Initially, we note that this argument appears to concede that the elimination of an entire line of management in which every manager is over the age of 40 does not per se raise an inference of discrimination (*see e.g. Hazen Paper Co. v Biggins*, 507 US 604, 611 [1993] ["an employee's age is analytically distinct from his years of service"]; *cf. Becker v City of New York*, 249 AD2d 96, 98 [1998] ["any group of people who elect early retirement will be comprised of older workers because only senior employees . . . qualify to participate in an early retirement plan"]).

In any event, however, plaintiffs have not established the premise upon which their argument rests, i.e., that a general age animus pervaded the RIF. Defendants, by meeting their burden of producing a legitimate explanation for the elimination of the Chief position, rebutted the presumption of discrimination raised by plaintiffs' statistics (*see Texas Dept. of Community Affairs v Burdine*, 450 US at 255), and plaintiffs have submitted no other evidence of this alleged general age animus.

In that regard, the affidavits of former Chiefs alleging that high-ranking OMRDD officials made age-based derogatory comments do not suffice. Fiorello Cicero, a Chief who was laid off in September 1989, stated that Commissioner Webb told him that summer that although he, Webb, wanted to keep the Chiefs, his staff had persuaded him that "the Chiefs were the old guards of the system and that OMRDD needed new and younger employees to take over the leadership of the agency as OMRDD moved more strongly into the community." Cicero also stated that in early 1990, Acting Commissioner Elin Howe told him that OMRDD needed "to make room for younger employees to advance in the system, and that with the contraction of staff, OMRDD needed to remove the old guard who was standing in the way of the community movement."

Joseph Moskowitz, another Chief who was laid off in September 1989, stated that in 1987, at a retirement dinner for one of the Chiefs, Mr. Robidoux, the director of Letchworth Village Development Center, remarked that that was "one down," and commented that Moskowitz was old enough to retire. In early 1988, Robidoux asked Moskowitz his age and whether he had enough "years in" to retire, and commented that Moskowitz's

position required someone younger and more energetic. After Moskowitz was reassigned, he heard from other staff members that Robidoux often referred to him as "the old man." Moskowitz said he believed Robidoux was one of the directors who strongly recommended to Webb that the Chiefs be laid off.

Mark G. Davis stated that in 1981, Fred McCormack, then director of the Long Island Developmental Center, referred to the Chiefs as "old, lazy and overpaid."

However, most of these remarks are not probative of an intent to discriminate. Even accepting that the remarks could be considered discriminatory, they were not made by decision makers and they were not made close in time to the decision to eliminate the Chiefs or in relation to the process of making the decision (*see Schreiber v Worldco, LLC*, 324 F Supp 2d 512, 519 [SD NY 2004]). No nexus has been shown to exist between the discriminatory remarks of certain directors and Webb's decision to eliminate the Chiefs (*id.* at 518). Indeed, the evidence shows that it was the staff of the Central Office, in conducting its agency-wide review in preparation for the RIF, that initially targeted the Chief title, and others, for elimination.

Webb's remark that his staff had persuaded him that "the Chiefs were the old guards of the system and that OMRDD needed new and younger employees to take over the leadership of the agency as OMRDD moved more strongly into the community" is the only remark in evidence that meets the criteria for being probative of an intent to discriminate (*id.*). However, even a decision maker's stray remark, without more, does not constitute evidence of discrimination (*see Danzer v Norden Sys., Inc.*, 151 F3d 50, 56 [2d Cir 1998]).

The letters written by three State Senators expressing their opposition to the OMRDD RIF do not provide the "other indicia of discrimination" that would raise Webb's remark to something more than a "stray" remark (*id.*). Nicholas Spano, Chairman of the Senate Mental Hygiene Committee, told then Commissioner Webb in a letter dated July 31, 1989 that the "1989-90 State Budget did not include eliminating these titles." He wrote to Barbara Zaron of New York State Management Confidential Employees on August 14, 1989 that Webb "has totally disregarded the provisions of the enacted 1989-90 New York State Budget." Nancy Larraine Hoffman wrote Zaron on August 24, 1989 that as a member of the Senate Finance Committee, she had supported efforts during the budget process "which I believe had eliminated the need for OMRDD layoffs." Michael J. Tully, Jr., Chairman of the Senate Health Committee, told Webb in a letter dated August 28, 1989 that "[w]e in the legislature felt

when the budget was passed that there were sufficient funds to avert the layoff of these positions."

However, the task force had determined eight years before OMRDD came under the pressure of budgetary constraints that resources were not being allocated wisely, that in particular the Chiefs were overpaid for the work they did, and that the Chief position had to be redefined and downgraded in terms of salary. Even if, strictly speaking, there was money available in the state treasury in 1989 to preserve the position, it is well documented that the decision to eliminate it had been made long before 1989 and was based on the findings of OMRDD's 1981 review of its Development Disabilities Services Offices management structures. Thus, even if the Senators' letters raised an inference that in 1989 it was not necessary to eliminate the position to save money, they do not raise an inference that the real reason for the decision was age discrimination.

Moreover, the Governor's 1989-90 Budget Submission to the Legislature, which included a narrative about OMRDD, acknowledged "the State's current fiscal problems" and "recognized that the Agency can best determine the distribution of available staff, and that the Commissioner must have the ability to reduce staffing levels, through selected layoffs if appropriate, to ensure the optimal mix of staff and clients as institutional census decreases." Individual state legislators' disagreement with these discretionary decisions of the Commissioner does not constitute evidence that the Commissioner's explanation for the RIF was a pretext for age discrimination.

Plaintiffs argue that OMRDD is attempting "to hide behind the coattails" of the documentation showing that the Chiefs were the subject of a study in 1981 and were "earmarked" in 1985. They contend that the task force found merely that the Chiefs were overcompensated for the work they did and recommended not that they be eliminated or even paid less, but that they be given more work. However, while the 1981 report does not in explicit terms recommend elimination of the position, it does recommend that the Chief title be changed and the salary reduced from M-5 to M-3, explaining that "[t]his grade level would place the position at a more appropriate level of compensation relative to management positions immediately above and below in the [developmental center] hierarchy, resulting in an improved program management career ladder," and "would equate this position with the compensation of the Developmental Disabilities Program Specialist IV position, which has comparable responsibilities in the management of community programs."

Plaintiffs contend that OMRDD's earmarking of the Chief title in 1985 also had nothing to do with the RIF implemented in 1989. They argue that earmarking meant not elimination of the position but a hiring freeze, and therefore that earmarking was not related to a financial crisis but was done to make sure that the existing and incumbent Chiefs were given enough work to do before more Chiefs were hired. However, the 1985 "Earmark Notice" states, "All items earmarked per DDSO Reorganization to be re-classified to the title of Developmental Service Manager M-3." In view of Hawes's explanation that earmarking meant that no vacated Chief position could be filled or used unless reclassified to the M-3 level, the clear import of the 1985 earmarking is that after the last incumbent departed from the Chief position, the position as such would no longer exist. Indeed, as Webb explained, in 1985 OMRDD contemplated the elimination of the position through attrition. Former Chief Classification and Pay Analyst McChesney stated that he authorized the earmarking of the Chief positions because "these titles were deleted from the management structure and were therefore, obsolete."

Plaintiffs claim that the reasons for the elimination of the Chief positions stated by then Commissioner Webb in his July 1989 memorandum to directors regarding implementing the RIF were inconsistent with statements in the earlier documentation. Plaintiffs contend that Webb's 1989 reference to the Chief positions as "vestigial" is inconsistent with the task force's 1981 conclusion that the Chiefs were underused as a group and that the incumbents should be given more work. However, there is no inconsistency in the use in 1989 of the word "vestigial" in connection with a position seen as problematic in 1981 and earmarked for elimination by attrition in 1985. Plaintiffs also argue that the only logical explanation for the fact that the title was not eliminated long before 1989, if it truly was already outmoded in 1981, is that it was an important one all along. However, the evidence establishes that the title was not eliminated before 1989 because it was not until 1989 that OMRDD deemed it necessary to do away with the position by means more expeditious than attrition.

Thus, plaintiffs' claim of discriminatory intent on defendants' part founders on the insufficiency of the evidence to raise an issue of fact as to the trustworthiness of defendants' explanation for the RIF and the elimination of the Chiefs. This insufficiency is also fatal to plaintiffs' claim of discrimination on the theory of disparate impact. Although plaintiffs need not prove discriminatory intent to establish a case of disparate impact (*see Smith*

*v Xerox Corp.*, 196 F3d 358, 364 [2d Cir 1999]), to prevail at trial, they must prove that defendants' facially neutral practices "fall more harshly on a protected group than on other groups *and cannot otherwise be justified"* (*Waisome v Port Auth. of N.Y. & N.J.*, 948 F2d 1370, 1374 [2d Cir 1991] [emphasis added]; *see also People v New York City Tr. Auth.*, 59 NY2d 343, 348-349 [1983] [under Human Rights Law an employer must justify a facially neutral practice that has a disparate impact on a protected class in terms of employee performance or business necessity]). Thus, to defeat summary judgment, plaintiffs must raise an inference that the elimination of the Chiefs cannot be justified by any explanation other than age discrimination, and this they failed to do. Concur—Tom, J.P., Mazzarelli, Saxe, Ellerin and Nardelli, JJ.