IntegrateNYC, Inc. v State of New York (2024 NY Slip Op 02369)

IntegrateNYC, Inc. v State of New York

2024 NY Slip Op 02369

Decided on May 02, 2024

Appellate Division, First Department

Moulton, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: May 02, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Peter H. Moulton Martin Shulman LlinÉt M. Rosado

Index No. 152743/21 Appeal No. 1230 Case No. 2022-02719 

[*1]IntegrateNYC, Inc., et al., Plaintiffs-Appellants,
v
The State of New York et al., Defendants-Respondents, Parents Defending Education, Intervenor Defendant-Respondent. The New York Civil Liberties Union, Amicus Curiae, The New York City Bar Association, Amicus Curiae.

Plaintiffs appeal from an order of the Supreme Court, New York County (Frank P. Nervo, J.), entered June 2, 2022, which granted defendants' and intervenor defendant's motions to dismiss the amended complaint on the ground that it did not present a justiciable controversy.

Sidley Austin LLP, New York (Melissa ColÓn-Bosolet, Eamon P. Joyce, Zachary J. Strongin, Karma O. Farra, Alyssa M. Hasbrouck, Ernesto R. Claeyssen of counsel), Sidley Austin LLP, District of Columbia (Carter G. Phillips of the bar of the district of Columbia, of counsel), Sidley Austin LLP, London, UK (Tanisha Singh of counsel), Peer Defense Project, New York (Sarah Medina Camiscoli of counsel), and Public Counsel, Los Angeles, CA (Mark D. Rosenbaum, Amanda Mangaser Savage, Kathryn Eidmann and Sarah Camiscoli of the bar of the State of the State of LA, California, of counsel), for appellants.
Letitia James, Attorney General, New York (Mark S. Grube and Ester Murdukhayeva of counsel), for State of New York, Governor of the State of New York, New York State Board of Regents, New York State Education Department and New York State Commissioner of Education, respondents.
Sylvia O. Hinds-Radix, Corporation Counsel, New York (Philip Young, Richard Dearing and Devin Slack of counsel), for Bill DeBlasio, Mayor of New York City, New York City Department of Education and Meisha Porter, Chancellor of the New York City Department of Education, respondents.
Dennis J. Saffran, Douglaston, NY, and Consovoy McCarthy PLLC, Arlington, VA (James F. Hasson, Taylor A.R. Meehan of the bar of the District of Columbia, admitted pro hac vice and Thomas S. Vaseliou of the bar of the State of Texas, admitted pro hac vice of counsel), for Parents Defending Education, respondent.
The New York Civil Liberties Union, New York (Stefanie D. Coyle, Arthur Eisenberg, Rae Shih, Molly K. Biklen and Camara Stokes Hudson of counsel), for The New York Civil Liberties Union Foundation, amicus curiae.
The New York City Bar Association, New York (Amber Leary, Emily G. Bass and Jonathan Glater of counsel), for The New York City Bar Association, amicus curiae.

Moulton, J. 

The New York City public school system is the largest in the United States. It consists of more than 1,850 schools and over one million students from diverse ethnic and racial backgrounds.[FN1] Despite the diversity of its students the City's public school system remains one of the most segregated in the country.[FN2]
Plaintiffs IntegrateNYC, Inc., a youth led organization "for racial integration and equity in New York City schools," two parent organizations, and current and former public school students commenced this lawsuit against the State and the City actors that oversee New York City's public education system. The State actors are the State of New York, Governor of the State of New York, the New York State Board of Regents, the New York State Education Department, and the New York State Commissioner of Education (collectively the State). [*2]The City actors are the Mayor of the City of New York, the New York City Department of Education, and its Chancellor (collectively the City).
Plaintiffs challenge State and City policies that plaintiffs claim deny Black and Latinx [FN3] students their state constitutional right to a "sound basic education" under article XI § 1 (Board of Educ., Levittown Union Free School Dist. v Nyquist, 57 NY2d 27, 48 [1982], appeal dismissed 459 US 1138, 1139 [1983]), deny them their state constitutional right to equal protection under article I, § 11, and subject them to unlawful discriminatory practices in violation of the New York State Human Rights Law (NYSHRL) (Executive Law § 290 et seq).
Prior to any discovery, the State, the City, and the intervenor defendant Parents Defending Education (PDE),[FN4] filed CPLR 3211 motions to dismiss the amended complaint based on a failure to state a cause of action. The State and the City additionally argued that the amended complaint was nonjusticiable. The motion court did not address defendants' extensive arguments for dismissal of the amended complaint based on a failure to state a cause of action. Rather, in a cursory decision, the court dismissed the amended complaint as nonjusticiable, focusing entirely on plaintiffs' request for injunctive relief.
This was error. We now modify.
The Amended Complaint
Plaintiffs' 84-page amended complaint asserts three causes of action against the State and the City. The first cause of action alleges a violation of article XI, § 1 of the New York State Constitution, the Education Article, which guarantees students an opportunity for a sound basic education. The second cause of action alleges a violation of article I, § 11 of the Equal Protection Clause of the New York State Constitution. The third cause of action alleges a violation of Executive Law § 296(4) of the NYSHRL, which provides that it is "an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified or to permit the harassment of any student or applicant by reason of his race." The amended complaint is not a model of clarity or concision, and it does not confine itself to legal argument. Some passages read more like an academic thesis than a pleading. However, the complaint describes a justiciable dispute, and it adequately states its causes of action. At the threshold of this action that is all that is required.
Plaintiffs allege that State and City policies create a "racialized" admission pipeline. According to plaintiffs, the pipeline begins with a single standardized test for the City's Gifted & Talented (G&T) programs taken by children as young as four-years-old. The G&T test, plaintiffs assert, disproportionately benefits "privileged" white students and their "in-the-know" parents, who have the "navigational capital" to understand the admissions process and the economic capital to pay for expensive test preparation. The G&T programs, plaintiffs allege[*3], provide superior academic preparation, which allows primarily white and Asian students to continue through the pipeline to academically screened middle and high schools, relegating Black and Latinx students to unscreened schools, often in poorly maintained buildings with limited extracurricular programs.[FN5] The end of the pipeline, or "zenith" as plaintiffs describe it, is admission to one of eight New York City specialized high schools based on the results of the Special High School Admissions Test (the SHSAT).[FN6]
The G&T test, the SHSAT, and other standardized admissions tests used in screened middle and high schools are, according to plaintiffs, "culturally biased" and not "pedagogically sound." To support these allegations, the amended complaint includes references to plaintiffs' experts. According to plaintiffs, their expert Dr. Allison Roda points out that "the City has never demonstrated that either its previous or current evaluation system—or, more generally, its early tracking of students into G&T versus general education programs—is pedagogically sound." They allege that their experts Dr. Ezekiel Dixon-RomÁn and Dr. Howard Everson opine that "standardized tests are neither designed nor intended to select students for specialized academic programs (the way they are utilized in admissions screens)." In addition, plaintiffs allege that their expert Dr. David E. Kirkland opines that the use of standardized tests "disadvantages Black and Latinx students, who face culturally biased test language and tasks."
The pipeline, plaintiffs claim, is designed to exclude Black and Latinx students from the City's prime educational opportunities. According to plaintiffs, the State and the City "intentionally adopted" and "for decades have intentionally retained—with no pedagogical basis—testing-based sorting that they know excludes students of color from equal educational opportunities." This knowledge was acquired, plaintiffs allege, "through decades of experience and reflected in [defendants] own admissions" including the knowledge of the public school system's "racist character and outcomes." Despite this knowledge, plaintiffs allege that the State and the City "intentionally refuse to dismantle . . . its racialized channeling system."
Plaintiffs plead that the 1971 Hecht-Calandra Act,[FN7] which mandated the SHSAT for three of the nine specialized high schools, was passed "to thwart the City's investigation of the test's potential bias against Black and Puerto Rican students." The amended complaint avers that the historical background leading to the passage of the Hecht-Calandra Act evinces discriminatory intent.
The amended complaint alleges that this pipeline is responsible for racially disparate and dismal results. For example, plaintiffs note that in 2018, 50 percent of Asian students and 35 percent of white students earned advanced Regents diplomas, as compared to 8 percent of Black students and 12 percent of Latinx students. They allege that in 2020[*4], the graduation rates for Black and Latinx students were, respectively, nearly 8 and 10 percentage points lower than the rate for white students. As another example, plaintiffs allege that in 2020, Black and Latinx students comprised nearly 70 percent of the school system, yet they received, respectively, only 4.5% and 6.6% of the specialized high school offers. Then, in 2021, Black and Latinx students received, respectively, only 3.6 and 5.4% of the specialized high school offers but white and Asian students received, respectively, 28 and 54% of the offers. The most extreme example plaintiffs point to is Stuyvesant High School. In 2019, plaintiffs allege that Stuyvesant had 895 openings but made offers to only 7 Black students and 33 Latinx students. The next year was no better, plaintiffs claim, because the special high school had 766 openings but made offers to only 10 Black students and 20 Latinx students.
The consequence of this racialized pipeline, plaintiffs assert, is that Black and Latinx students are largely shunted to unscreened schools, which frequently are housed in dilapidated and unsanitary buildings, where students are taught by the least experienced teachers and deprived of adequate educational resources.
Apart from the segregation of the City's schools caused by the racialized pipeline, the complaint also alleges that New York City public schools lack a "culturally responsive curriculum"; lack "teacher diversity"; fail to provide "sufficient training, support, and resources to enable administrators, teachers, and students to identify and dismantle racism"; create "hostile and discriminatory" school environments; and use "racially disproportionate discipline." According to plaintiffs, a diverse curricula and teacher force, sufficient resources, and affirming school environments are associated with improved outcomes. The improved outcomes, plaintiffs allege, would include better standardized tests scores, an increased number of earned advanced Regents diplomas, increased graduation rates, and decreased drop-out rates.
To remedy these alleged wrongs, plaintiffs seek a declaration that the State and the City violated the Education Article and the Equal Protection Clause of the New York State Constitution, and the NYSHRL. Plaintiffs also seek injunctive relief eliminating the G&T test, middle and high school admissions screens, and the SHSAT (and prohibiting their future use to the extent that they operate in a racially discriminatory manner); adopting evidence-based programs to improve recruitment and retention of school leaders, administrators, teachers, social workers, and guidance counselors of color; monitoring and enforcement of the public schools' compliance with New York State Education Department's Culturally Responsive-Sustaining Education Framework (the State CR-SE Framework);[FN8] establishing a system of accountability; and preparing a plan designed to cure the violations.
Discussion
I. Justiciability The court incorrectly [*5]found that plaintiffs' request for injunctive relief rendered the entire case nonjusticiable (see Center for Independence of the Disabled v Metropolitan Transp. Auth., 184 AD3d 197, 208 [1st Dept 2020] [the defendants' nonjusticiability argument lacked merit because it "[f]ocus[ed] only on that aspect of [the] plaintiffs' prayer for relief, seeking judicial imposition of a remedial plan to eliminate discrimination"]). In doing so, the court ignored plaintiffs' request for declaratory relief and the merits of their constitutional and statutory claims.
It was incumbent on the motion court to evaluate the merits of plaintiffs' claims. This is because it is "the province of the Judicial branch to define, and safeguard, rights provided by the New York State Constitution" (Campaign for Fiscal Equity v State of New York, 100 NY2d 893, 925 [2003] [CFE II]). Thus, "where a statutory or constitutional provision is at root of a dispute, the courts may offer the definitive resolution of these issues of law . . . [a]lthough these matters touch, often deeply, educational policies" (James v Board of Educ. of City of N.Y., 42 NY2d 357, 365-366 [1977]). Indeed, it is "the responsibility of the courts" to do so, even if the "the courts might encounter great difficulty in fashioning and then enforcing particularized remedies appropriate to repair unconstitutional action on the part of the Legislature or the executive" (Levittown, 57 NY2d at 39).
According to defendants, the motion court correctly dismissed the action as nonjusticiable because the remedies that plaintiffs requested would require the judiciary to act as an "education czar," a "super-legislature," or a "super-superintendent for the City's public schools." We agree that none of these roles are appropriate for the judiciary (see e.g. CFE II, 100 NY2d at 925 [with respect to education financing, courts "have neither the authority, nor the ability, nor the will, to micromanage"]).
However, even if, upon a finding of liability, a court could not grant the full panoply of injunctive relief sought by plaintiffs, a case may still be justiciable. Significantly, cases involving "[r]acial discrimination" are commonly heard by the courts even though they touch "often deeply" education policies (James, 42 NY2d at 365-366). The judiciary is also "responsible for adjudicating the nature of [educational adequacy]" (Campaign for Fiscal Equity v State of New York, 86 NY2d 307, 315 [1995] [CFE I]).
Defendants argue that education adequacy cases are justiciable only when the challenge is to New York State's funding methods. We disagree. The Court of Appeals has never articulated such a constrained view. Indeed, if Education Article challenges unrelated to the constitutionality of New York State's funding methods were categorically not justiciable, the Court of Appeals has had numerous opportunities to say so (see e.g. Paynter v State of New York, 100 NY2d 434, 439 [2003] [affirming dismissal of the plaintiffs' Education [*6]Article claim based on a failure to state a cause of action, not on the lack of a justiciable controversy]). What is important is that the students receive the appropriate "'resources'—financial or otherwise" (New York Civ. Liberties Union v State of New York, 4 NY3d 175, 180 [2005]; see also Davids v State of New York, 159 AD3d 987, 991 [2d Dept 2018] [Education Article claim stated based on ineffective teaching, not inadequate funding]).
In any event, plaintiffs sought a declaration, which is justiciable (see Klostermann v Cuomo, 61 NY2d 525, 538-539 [1984] ["The primary purpose of declaratory judgments is to adjudicate the parties' rights," which "contemplates that the parties will voluntarily comply with the court's order"]; see also Campaign for Fiscal Equity, Inc. v State of New York, 8 NY3d 14, 27 [2006] [noting the recent enactment of "legislation designed to allow the State to remedy inadequacies in New York City schools facilities" in response to the Court's finding that the State violated the Education Article]). Furthermore, courts are not confined to relief sought by plaintiffs (see CPLR 3017 [a] [the court is empowered to "grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded"]).
II. Failure to State a Claim
Defendants maintain that even if the complaint is justiciable, we should affirm dismissal of the amended complaint based on the alternative grounds that they urged below — that is, plaintiffs' failure to plead any viable cause of action. We decline to do so, however, because the amended complaint states viable causes of action against both the State and the City.
The Education Article The Education Article states: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (NY Const art XI, § 1). The Court of Appeals has interpreted this provision to encompass the requirement that the State offer students "a sound basic education" (Levittown, 57 NY2d at 48). However, the Education Article does not guarantee 'that all education facilities and services would be equal throughout the State'" (id. at 47; see also Reform Educ. Fin. Inequities Today [R.E.F.I.T.] v Cuomo, 86 NY2d 279, 284 [1995] [the Education Article does not contain "an egalitarian component"]). Rather, the Education Article guarantees only a "constitutional floor with respect to educational adequacy" (CFE I, 86 NY2d at 315). An Education Article claim must allege a "district-wide failure" to provide a sound basic education (New York Civ. Liberties Union, 4 NY3d at 181).
The right to a sound basic education is violated when there is a "gross and glaring inadequacy" (Paynter, 100 NY2d at 439). To sustain a violation, courts have looked to evidence of deficient "inputs" in "teaching, facilities and instrumentalities of learning" and "their resulting 'outputs,' such as test results and graduation and dropout rates" (CFE II, 100 [*7]NY2d at 903, 908). A plaintiff must also demonstrate causation (Paynter, 100 NY2d at 440). Poor educational outcomes alone are not sufficient to prove deprivation of a sound basic education, because "'a myriad of factors' influence student performance" (id.). The concept of a sound basic education is a dynamic one that has, to a large extent, evolved over time to "serve the future" (CFE II, 100 NY2d at 931).
CFE II anchored the definition to "a meaningful high school education, one which prepares [schoolchildren] to function productively as civic participants" (100 NY2d at 908).[FN9] A broad definition was warranted, the Court reasoned, even if "a sound basic education back in 1894, when the Education Article was added . . . consisted of an eighth or ninth grade education" (id. at 931). The definition had to "serve the future as well as the case now before us" and, based on the evidence, the Court found that "a high school level education is now all but indispensable" (id. at 931, 906).
The amended complaint sufficiently alleges that State and City policies cause New York City public school students, particularly Black and Latinx students, to receive less than the sound basic education to which they are entitled by the Education Article. The complaint alleges that these admissions policies result in Black and Latinx students attending severely segregated schools that are underresourced. The complaint avers, tersely but adequately, that there are inadequate "inputs" at such segregated, unscreened schools. It cites the dearth of adequate teaching materials; the overabundance of large class sizes; the absence of sports, arts, and other extracurricular programs; and the parlous physical state of school buildings.
In addition, plaintiffs allege that a sound basic education requires certain inputs to ameliorate the effects of racism and poverty. These include curricular change, away from what the complaint alleges is Eurocentric pedagogy and towards more inclusive teaching materials. They also include recruitment policies that attract more Black and Latinx teachers and administrators, and training for all teachers to combat structural racism. No court has yet found that such inputs are necessary for a sound basic education.
Contrary to the City's argument, CFE II did not define a "meaningful" education by incorporating the Court's earlier definition in CFE I which was tied solely to basic literacy, calculating, and verbal skills (see CFE II, 100 NY2d at 905-907). Rather, CFE II expanded the definition of a sound basic education and contemplated that the requisite skills for meaningful civic participation might involve more than basic academic skills (which are skills tied to traditional inputs) (id.).
Moreover, the State and City's own policies certainly acknowledge the importance of plaintiffs' novel inputs. As plaintiffs point out, the State CR-SE Framework makes recommendations to educators in New York so that all students can be effectively and equitably [*8]educated (including, among other things, recommendations on inclusive curriculum, creating affirming environments, and providing appropriate supports and services). Beyond the State CR-SE Framework, the State and City have acknowledged the importance of initiatives that enhance and encourage diversity, equity, and inclusion in the City's schools.[FN10] While defendants insist that such initiatives, and the related CS-RE framework, are aspirational, not mandatory, these policies provide some support for plaintiffs' claims.
Whether plaintiffs can show that the absence of such novel inputs causes New York City public school students to receive less than a sound basic education is a question of fact that can only be resolved after development of the record.
Plaintiffs have also adequately alleged "outputs" that indicate New York City public schools fail to provide a sound basic education and defendants do not dispute this allegation. In fact, they are aware of it. The statistics concerning educational outcomes for Black and Latinx New York City public school students are set forth above and need not be repeated here. The disparity in graduation rates, access to competitive schools, conferral of Regents diplomas, is adequately alleged in the amended complaint. These outputs provide some support for plaintiffs' assertion that the State and City's policies deprive a substantial portion of Black and Latinx students of a sound basic education. The State and City's efforts to blame each other do not support dismissal. The State argues that the alleged harms arise from the City's operation of the public schools, not the State's "narrow" oversight role. The City, in turn, blames the State and argues that the "plain text" of the Education Article is directed to the State, not individual school districts (see NY Const art XI, § 1 ["The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated"]).
Taken together, the State and City's arguments lead to the nonsensical result that no government entity is responsible for a sound basic education. True, under the Education Law, the City controls public school admissions, hires and trains the educators, and develops curriculum and testing content (including revising the SHSAT and maintaining a Discovery program for admission of disadvantaged students). However, because "the Board of Education and the City are creatures or agents of the State, which delegated whatever authority over education they wield . . . the State remains responsible when the failures of its agents sabotage the measures by which it secures for its citizens their constitutionally-mandated rights" (CFE II, 100 NY2d at 922 [internal citation and quotation marks omitted]).
The City's efforts to blame the State are equally infirm. The State's ultimate responsibility for constitutional compliance does not override the City's responsibility to use its delegated [*9]authority in compliance with the Education Article (see New York Civ. Liberties Union, 4 NY3d at 182 [the plaintiffs misinterpreted CFE II's recognition that education "is ultimately a responsibility of the State" as "a holding that education is not ultimately a responsibility of school districts"]; see also Davids, 159 AD3d at 991 [Educational Article claim was properly asserted against the City of New York and New York City Department of Education for retaining ineffective teachers]).
Finally, dismissal is not warranted based on the City's and PDE's argument that plaintiffs' allegations are inconsistent with the Education Article's "state-local partnership," as was the case in Paynter (100 NY2d at 442). In Paynter, the plaintiffs alleged that "high concentrations of racial minorities and poverty in the school district" lead "to abysmal student performance" (id. at 438). This was not a viable theory, the Court held, because it would subvert the right of the residents "to participate in the governance of their own schools" by making New York State responsible for "where people choose to live" or require that the State "redraw school district lines, negating the preferences of the residents" or require "residents of more attractive districts . . . to provide for students from other districts" (id. at 442-443). Here, unlike Paynter, plaintiffs do not challenge residence-based placement. Indeed, the amended complaint alleges that Black and Latinx students attend "more segregated and lower performing schools than they would if their place of residence alone determined school placement." Rather, plaintiffs' challenge relates to the "inadequacy of teaching, facilities or instrumentalities of learning" in the schools to which Black and Latinx students are relegated, which was not challenged in Paynter (see id. at 437-438 [the "plaintiffs here claim no inadequacy of teaching, facilities or instrumentalities of learning"]).
Equal Protection
The equal protection guarantees in the Equal Protection Clauses of the New York State and the United States Constitutions "are coextensive" (Myers v Schneiderman, 30 NY3d 1, 13 [2017]). The guarantees are of "equal laws, not equal results" (Personnel Admr. of Mass. v Feeney, 442 US 256, 273 [1979]). To demonstrate an equal protection violation based on an official action (or inaction) that disproportionately impacts a suspect class, a plaintiff must establish discriminatory intent or purpose (see CFE I, 86 NY2d at 321; Arlington Hgts. v Metro. Hous. Corp., 429 US 252, 264-265 [1977]; Washington v Davis, 426 US 229, 240 [1976]). To prove intent or purpose, a plaintiff must establish "more than intent as volition or intent as awareness of consequences. . . . It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group" (Feeney, 442 US at 279). However, a plaintiff [*10]need only prove that a discriminatory intent or purpose is a "motivating factor" for the alleged actions, not that it is a "dominant" or "primary" factor (Arlington Hgts, 429 US at 265-266).
Determining intent or purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" (id. at 266). "[Q]uite obviously, discrimination is rarely admitted" and thus, it is rarely susceptible to direct proof (Mhany Mgt. v County of Nassau, 819 F3d 581, 610-611 [2d Cir 2016]). The "impact of the official action . . . may provide an important starting point" but apart from the rare case, "it is not the sole touchstone of an invidious racial discrimination" (Arlington Hgts, 429 US at 265-266). Other relevant considerations include: "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," "[t]he specific sequence of events leading up to the challenged decision" including when there is a sudden change, "[d]epartures from the normal procedural sequence," "[s]ubstantive departures," and "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body" (id. at 267-268).
Plaintiffs essentially argue that the education afforded Black and Latinx students in New York City public schools is unequal by design. "The foreseeability of a segregative effect, or '[a]dherence to a particular policy or practice, 'with full knowledge of the predictable effects of such adherence upon racial imbalance,' is a factor that may be taken into account in determining whether acts were undertaken with segregative intent" (United States v Yonkers Bd. of Educ., 837 F2d 1181, 1227 [1987], cert denied 486 US 1055 [1988] quoting Columbus Bd. of Educ. v Penick, 443 US 449, 465 [1979]; see also Feeney, 442 US at 279 n 25 ["This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent"]). The fact that a government actor was on notice of a disparate impact and did nothing to ameliorate it can be a factor (see Davis v City of New York, 959 F Supp 2d 324, 362-363 [SD NY 2013]). Even when remedial efforts are taken, it is still possible to infer intent based on "the inadequacy" of those efforts (Floyd v City of New York, 813 F Supp 2d 417, 453 [SD NY 2011]).
Defendants argue that the Equal Protection claim fails because plaintiffs' allegations of discriminatory intent are conclusory. They maintain that at most the allegations raise an inference that the State and the City were aware that facially neutral admissions policies had a disparate impact on Black and Latinx students, not that they were adopted or retained "because of" their adverse impact on race. The City additionally argues that plaintiffs' allegations of discriminatory intent against it are undermined by other allegations in the amended complaint.
While a close question, plaintiffs sufficiently pleaded intent in connection with their equal protection challenge to the G&T test, the SHSAT, and other standardized admissions tests used in screened middle and high schools.1 [FN1]
Admittedly, the facts supporting an inference of discriminatory intent against the State and the City are thin, as one might expect given that discrimination is "rarely admitted" (Mhany Mgt, 819 F3d at 610-611). However, we must afford plaintiffs "the benefit of all favorable inferences which may be drawn from their pleading, without expressing our opinion as to whether they can ultimately establish the truth of their allegations before the trier of fact" (CFE I, 86 NY2d at 318). Therefore, for purposes of this motion to dismiss, we assume the truth of plaintiffs' allegations that the G&T test, the SHSAT, and other standardized admissions tests at screened schools are culturally biased and not pedologically sound.
We begin with the alleged disparate impact on Black and Latinx students, which "provide[s] an important starting point" (Arlington Hgts., 429 US at 266). Defendants do not challenge the existence of the impacts which are, as alleged here, severe.
The legislative history of the Hecht-Calandra Act, the timing of its enactment, and the contemporaneous statements of its co-sponsor are also factors that support an inference of segregative intent (id. at 267-268). While defendants disagree, plaintiffs allege that the Hecht-Calandra Act was designed to exclude Black and Latinx students from specialized high schools and to "stymie" efforts to study discrimination in admissions testing. Notably, the Hecht-Calandra Act was passed within seven months of the Chancellor's announcement of a commission to evaluate whether admissions testing was "culturally biased." The statements of the bill's co-sponsor provide some support for plaintiffs' theory that the Hecht-Calandra Act was passed to thwart the commission's efforts (see Assembly Mem in Support, Bill Jacket, L 1971, ch 1212 at 3 [the bill should be passed to protect specialized high schools from "the continued threat" of "political pressure groups" and from the Chancellor who placed "another cloud over the heads of the specialized high schools by appointing a committee to investigate the schools and their admission procedures"]).
Finally, plaintiffs' allegations that the State and the City knew about the segregative effect of discriminatory testing "for decades" yet continued to adhere to it also weighs in favor of an inference that the State and the City intended the "predictable effects of such adherence upon racial imbalance in the school system" (Columbus Bd. of Educ., 443 US at 465; Yonkers Bd. of Educ., 837 F2d at 1227).
The City's argument that plaintiffs' allegations of intent against it are undermined by other allegations in the amended complaint is not a basis to dismiss the claim. Plaintiffs acknowledge that the City changed the G&T admissions requirements [*11]in 2021, which they describe as a "'last-minute' decision to replace one discriminatory evaluation mechanism with another." Plaintiffs also refer to the City's Discovery and Dream programs in the amended complaint, which they describe as "too little and too late to correct the gross racial imbalances in access to 'elite' public schools."1 [FN2] While a fact finder may determine that the City lacks discriminatory intent based on these facts, they do not negate plaintiffs' allegations that the City relies on culturally biased and pedagogically unsound testing. As plaintiffs point out, the Discovery program is still based on proximity to SHSAT cutoff scores. Furthermore, even when remedial efforts are taken, it is still possible to infer intent based on "the inadequacy" of those efforts, which presents a factual issue inappropriate for resolution here (Floyd, 813 F Supp 2d at 453).
NYSHRL Plaintiffs' NYSHRL claim is based on Executive Law § 296(4), which provides that it is "an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified or to permit the harassment of any student or applicant by reason of his race" (Executive Law § 296[4]).
The term "educational institution" is defined as:
"(a) any education corporation or association which holds itself out to the public to be non-sectarian and exempt from taxation pursuant to the provisions of article four of the real property tax law; or
(b) any for-profit entity that operates a college, university, licensed private career school or certified English as a second language school which holds itself out to the public to be non-sectarian and which is not exempt from taxation pursuant to the provisions of article four of the real property tax law; or
(c) any public school, including any school district, board of cooperative educational services, public college or public university."
(Executive Law § 292[40][a-c]).
Preliminarily, we agree with the State's argument that plaintiffs cannot state a NYSHRL claim against it because the State is not an "educational institution" as defined in the Executive Law. Plaintiffs' argument that the NYSED and the New York State Board of Regents are educational institutions covered by Executive Law § 296(4) is meritless. Plaintiffs assert that the words "educational" and "institution" should be construed according to their ordinary meaning and cite the dictionary definition of "institution: an established organization or corporation . . . especially of public character." However, it is only "[i]n the absence of a statutory definition [that] we construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as useful guideposts in determining the meaning of a word or phrase" (Yaniveth R. v LTD Realty Co., 27 NY3d 186, 192 [2016] [citation omitted]).
Because plaintiffs overlook the statutory definition of "educational institution[*12]" in Executive Law § 292(40), they do not explain why the State fits within that definition. Certainly, the State is not an "education corporation or association" that holds itself out to the public to be nonsectarian and exempt from taxation pursuant to the provisions of article four of the Real Property Tax Law.1 [FN3] The State is not a "for-profit" entity that operates a college, university, licensed private career school, or certified English as a second language school. The State is not a "public school." Consequently, plaintiffs fail to state a cause of action under the NYSHRL against the State.
Finally, plaintiffs' allegations that the State and the City knew about the segregative effect of discriminatory testing "for decades" yet continued to adhere to it also weighs in favor of an inference that the State and the City intended the "predictable effects of such adherence upon racial imbalance in the school system" (Columbus Bd. of Educ., 443 US at 465; Yonkers Bd. of Educ., 837 F2d at 1227).
The City's argument that plaintiffs' allegations of intent against it are undermined by other allegations in the amended complaint is not a basis to dismiss the claim. Plaintiffs acknowledge that the City changed the G&T admissions requirements in 2021, which they describe as a "'last-minute' decision to replace one discriminatory evaluation mechanism with another." Plaintiffs also refer to the City's Discovery and Dream programs in the amended complaint, which they describe as "too little and too late to correct the gross racial imbalances in access to 'elite' public schools."1 [FN4] While a fact finder may determine that the City lacks discriminatory intent based on these facts, they do not negate plaintiffs' allegations that the City relies on culturally biased and pedagogically unsound testing. As plaintiffs point out, the Discovery program is still based on proximity to SHSAT cutoff scores. Furthermore, even when remedial efforts are taken, it is still possible to infer intent based on "the inadequacy" of those efforts, which presents a factual issue inappropriate for resolution here (Floyd, 813 F Supp 2d at 453).
NYSHRL Plaintiffs' NYSHRL claim is based on Executive Law § 296(4), which provides that it is "an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified or to permit the harassment of any student or applicant by reason of his race" (Executive Law § 296[4]).
The term "educational institution" is defined as:
"(a) any education corporation or association which holds itself out to the public to be non-sectarian and exempt from taxation pursuant to the provisions of article four of the real property tax law; or
(b) any for-profit entity that operates a college, university, licensed private career school or certified English as a second language school which holds itself out to the public to be non-sectarian and which is not exempt from taxation pursuant to the provisions [*13]of article four of the real property tax law; or
(c) any public school, including any school district, board of cooperative educational services, public college or public university."
(Executive Law § 292[40][a-c]).
Preliminarily, we agree with the State's argument that plaintiffs cannot state a NYSHRL claim against it because the State is not an "educational institution" as defined in the Executive Law. Plaintiffs' argument that the NYSED and the New York State Board of Regents are educational institutions covered by Executive Law § 296(4) is meritless. Plaintiffs assert that the words "educational" and "institution" should be construed according to their ordinary meaning and cite the dictionary definition of "institution: an established organization or corporation . . . especially of public character." However, it is only "[i]n the absence of a statutory definition [that] we construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as useful guideposts in determining the meaning of a word or phrase" (Yaniveth R. v LTD Realty Co., 27 NY3d 186, 192 [2016] [citation omitted]).
Because plaintiffs overlook the statutory definition of "educational institution" in Executive Law § 292(40), they do not explain why the State fits within that definition. Certainly, the State is not an "education corporation or association" that holds itself out to the public to be nonsectarian and exempt from taxation pursuant to the provisions of article four of the Real Property Tax Law.1 [FN5] The State is not a "for-profit" entity that operates a college, university, licensed private career school, or certified English as a second language school. The State is not a "public school." Consequently, plaintiffs fail to state a cause of action under the NYSHRL against the State.
In addition, we agree with the City and PDE that plaintiffs fail to sufficiently plead that the City "permit[ed] the harassment of any student or applicant, by reason of his race" in violation of Executive Law § 296(4). Plaintiffs plead that Black and Latinx students are generally subject to harassment in the City's public schools, and they provide examples of a few incidents at Brooklyn Technical High School and at PS 132. However, the amended complaint fails to allege that the City permitted this harassment because there are no nonconclusory allegations in its 84 pages indicating that the City even knew about these incidents, which occurred in 2 of its more than 1,850 public schools.
Plaintiffs' allegations that the City denied Black and Latinx students "the use of its facilities to any person otherwise qualified . . . by reason of his race" through discriminatory admissions testing, stand on different footing. Contrary to the City's argument, plaintiffs sufficiently allege that the students were "otherwise qualified" for admission, considering that they allege a denial of access to the City's best schools "to [*14]which they have equal right." Brown v Einstein Coll. of Medicine of Yeshiva Univ. (172 AD2d 197 [1st Dept 1991]) is inapposite. The City relies on Brown for its implicit argument that Black and Latinx students who are not admitted to the City's prime educational facilities can never be "otherwise qualified" for admission because their tests scores are too low. In Brown, this Department affirmed the trial court's dismissal of the plaintiff's age discrimination lawsuit against a medical school because the applicant's academic performance (his grade point average and medical college admission test scores) was far below the accepted standard for admission to the school. However, the plaintiff in Brown did not allege that the medical school denied him admission based on the use of discriminatory testing. Here, plaintiffs' allegations presume that but for the discriminatory admissions testing, Black and Latinx students would not have been excluded from the City's best educational programs.
Contrary to the City's and PDE's argument, plaintiffs sufficiently allege that they were denied access to the City's facilities "by reason of [their] race" for the same reasons that they sufficiently allege discriminatory intent in connection with their Equal Protection claim. In any event, because a NYSHRL claim is not analyzed in the same way as an Equal Protection claim, it would not matter if plaintiffs failed to allege discriminatory intent (see People v New York City Tr. Auth., 59 NY2d 343, 348-349 [1983] ["an employment practice neutral on its face and in terms of intent which has a disparate impact upon a protected class of persons violates the New York Human Rights Law unless the employer can show justification for the practice in terms of employee performance"]; Mete v New York State Off. of Mental Retardation & Dev. Disabilities, 21 AD3d 288, 296-297 [1st Dept 2005] ["plaintiffs need not prove discriminatory intent to establish a case of disparate impact . . . (but) to prevail at trial, they must prove that defendants' facially neutral practices 'fall more harshly on a protected group than on other groups and cannot otherwise be justified'" (internal citation omitted)]).
Although there appears to be no binding authority addressing whether a disparate impact claim under the NYSHRL applies to education cases, we see no reason to limit a disparate impact claim to employment cases, as the City and PDE urge us to do. The analysis should be the same whether the alleged discriminatory testing is required to secure employment or whether it is required to secure admission to the City's prime educational opportunities which leads to employment. The fact that Executive Law § 296(1) provides that it is an unlawful discriminatory practice for an employer to refuse to hire someone "because of" the individual's race, while Executive Law § 296(4) prohibits an education institution from denying the use of its facilities "by reason of" the individual's race, does not [*15]support a limitation. PDE suggests no reason, and we can think of none, why we should limit disparate impact cases to the employment context based on this slightly different terminology.
Accordingly, the order of Supreme Court, New York County (Frank P. Nervo, J.), entered June 2, 2022, which granted defendants' and intervenor defendant's motions to dismiss the amended complaint on the ground that it did not present a justiciable controversy, should be modified, on the law, to deny defendants' motions on that ground, and to deny defendants' and intervenor defendant's motions as to the first and second causes of action and that portion of the third cause of action against Bill de Blasio, Mayor of the City of New York, the New York City Department of Education, and its Chancellor, Meisha Porter based on the denial of the use of its facilities, and otherwise affirmed, without costs.
Order, Supreme Court, New York County (Frank P. Nervo, J.), entered June 2, 2022, modified, on the law, to deny defendants' and intervenor defendant's motions as to the first and second causes of action and that portion of the third cause of action against Bill de Blasio, Mayor of the City of New York, the New York City Department of Education, and its Chancellor, Meisha Porter based on the denial of the use of its facilities, and otherwise affirmed, without costs.
Opinion by Moulton, J. All concur.
Manzanet-Daniels, J.P., Moulton, Shulman, Rosado, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: May 2, 2024

Footnotes

Footnote 1: 1See New York City Public Schools, DOE Data At a Glance, available at https://www.schools.nyc.gov/about-us/reports/doe-data-at-a-glance [last accessed on April 11, 2024].

Footnote 2: 2See NY City Council, School Diversity in NYC, available at https://council.nyc.gov/data/school-diversity-in-nyc [last accessed on April 11, 2024].

Footnote 3: 3We use the terms Black and Latinx because those are the terms plaintiffs use in the complaint. We recognize that "Latinx" is a term that has not gained universal acceptance among people it is meant to encompass.

Footnote 4: 4PDE is a nationwide, Virginia-based organization. Its members include the parents of six New York City public school students. As described in their motion to intervene, PDE's mission is to prevent "the politicization of K-12 education" and to oppose "curriculum steeped in critical race theory, and other policies that inject politics and ideology into the class-room against parents' wishes." The organization's website indicates that it fights "indoctrination in the classroom," expressing views that "activists" have targeted schools to "impose ideologically driven curriculum" that improperly emphasizes "group identities: race, ethnicity, religion, sexual orientation and gender" (Parents Defending Education, About Us: Who We Are, available at https://defendinged.org/about [last accessed April 11, 2024]).

Footnote 5: 5A screened school is one that admits students based on selective academic criteria, typically judged by test scores, grades, class rankings, or essays. An unscreened school has no selective academic requirements.

Footnote 6: 6There are nine specialized high schools in New York City: Bronx High School of Science, Brooklyn Latin School, Brooklyn Technical High School, Fiorello H. LaGuardia High School of Music and Art and Performing Arts, High School for Math, Science and Engineering at City College, High School of American Studies at Lehman College, Queens High School for the Sciences at York College, Staten Island Technical High School, and Stuyvesant High School. Plaintiffs do not consider LaGuardia as part of the pipeline because that school admits students "via audition."

Footnote 7: 7The Hecht-Calandra Act provides, in relevant part, that "[a]dmission to the Bronx High School of Science, Stuyvesant High School and Brooklyn Technical High School and such similar further special high schools which may be established shall be solely and exclusively by taking a competitive, objective and scholastic achievement examination, which shall be open to each and every child in the city of New York in either the eighth or ninth year of study, without regard to any school district wherein the child may reside" (Education Law § 2590-g[12][b][1997] [incorporated by reference into Education Law § 2590-h(1)(b)].

Footnote 8: 8In 2018, the New York State Education Department (NYSED) convened a panel of experts to evaluate the role of diversity, equity, and inclusion in education. Based on expert recommendations, the NYSED adopted the State CR-SE Framework to aid local school districts in advancing diversity, equity, and inclusion in their schools (available at
https://www.nysed.gov/sites/default/files/programs/crs/culturally-responsive-sustaining-education-framework.pdf [last accessed April 11, 2024]). In 2019, the New York City Department of Education adopted its framework (see https://infohub.nyced.org/in-our-schools/programs/race-and-equity/equity-literacy/culturally-responsive-and-sustaining-education-implementation-supports [last accessed April 11, 2024]).

Footnote 9: 9CFE II held that a sound basic education also included "an employment component" which "was implicit in the standard" outlined in CFE I (100 NY2dat 905).

Footnote 10: 10 See New York State Board of Regents Policy On Diversity, Equity and Inclusion, effective May 10, 2021, available at
https://www.regents.nysed.gov/sites/regents/files/521bra7.pdf [last accessed April 11, 2024] ["A growing body of research finds that all students benefit when their schools implement strong Diversity, Equity and Inclusion (DEI) policies and practices," which "can lead to improved student achievement, which in turn can lead to better outcomes in other areas of their lives, including work and civic engagement"]; NYSED May 10, 2021 press release, available at https://www.nysed.gov/news/2023/board-regents-acts-measures-promote-civic-education-and-bring-diversity-equity-and [last accessed April 11, 2024] [noting the Commissioner of Education's statement that "(c)ivics education, when steeped in the fundamentals of the Board's Diversity, Equity and Inclusion initiative, will provide students with the knowledge and skills necessary to question and engage in civil discourse and offer sustainable solutions to issues that are important to them and their communities"]; The New York State Office of the Attorney General and the New York State Board of Regents Joint Guidance, dated August 9, 2023, available at https://www.nysed.gov/sites/default/files/programs/diversity-equity-inclusion/oag-nysed-dei-guidance.pdf [last accessed April 11, 2024] ["(p)ublic schools cannot meet their legal obligations unless they place DEI at the center of their work"]; NYSED August 9, 2023 press release, available at https://www.nysed.gov/news/2023/attorney-general-james-and-nysed-commissioner-rosa-issue-guidance-promote-diversity-equity [last accessed April 11, 2024] [noting the Chancellor of the Board of Regents' statement that "(i)t is crucial that all school districts develop and implement policies that promote (DEI) with urgency and fidelity . . . As future leaders of New York State, it is essential that our students are equipped with critical thinking skills and a deep understanding of civic engagement"]; The New York City Department of Education Cultural Responsive-Sustaining Education framework, available at https://www.schools.nyc.gov/about-us/vision-and-mission/culturally-responsive-sustaining-education [last accessed April 11, 2024] ["(n)umerous studies across the country show that CR-SE increases student participation, attendance, grade point averages, graduation rates, civic engagement, self-image, and critical thinking skills"]; see also Education Law § 10 [the Dignity Act] ["(t)he legislature finds that students' ability to learn and to meet high academic standards, and a school's ability to educate its students, are compromised by incidents of discrimination or harassment including bullying, taunting or intimidation"]).

Footnote 1: 11Plaintiffs fail to plead discriminatory intent with respect to academic screens unrelated to standardized testing (e.g., screens using grades, class ranking, essays, or interviews). As plaintiffs allege, the pipeline may be "unfair" because it creates "a sorting process that systematically advantages members of groups with the greatest social and economic resources" leading to "unequal, unjust, and intolerable outcomes." However, these allegations implicate educational equity. They do not substitute for allegations of discriminatory intent.

Footnote 2: 12The Discovery program allows students with low socioeconomic status to gain admission to a specialized high school based on the student's proximity to SHSAT cutoff scores and enrollment in a summer enrichment program. The Dream program provides SHSAT preparation to low socioeconomic status students with higher New York State standardized test scores.

Footnote 3: 13The term "education corporation or association" is not defined in the NYSHRL (see Matter of North Syracuse Cent. School Dist. v New York State Div. of Human Rights, 19 NY3d 481, 490 [2012]). The Court of Appeals traced the origins of that term to the Tax Law, which referred to "private, non-sectarian entities that are exempt from taxation under RPTL article 4" (id.). In other words, the term referred to "private, non-sectarian entities that owned 'educational' property utilized for a public purpose" not to the property of a municipal corporation which is held for a public use "i.e., school district property" (id. at 491, 493). As a result of the holding in Matter of North Syracuse (which concluded that the New York State Division of Human Rights lacked jurisdiction to investigate racial harassment complaints against public school districts), the legislature expanded the definition of "educational institution" to include public schools (see Assembly Mem in Support, Bill Jacket, L 2019, ch 116 [extending protection against discrimination, harassment and bullying "to public educational institutions, and not just to private schools, as was held in 2012 by the Court of Appeals in North Syracuse Central Sch. Dist. v. N.Y. State Div. of Human Rights"]). However, it did not amend the definition of "education corporation or association."

Footnote 4: 14The Discovery program allows students with low socioeconomic status to gain admission to a specialized high school based on the student's proximity to SHSAT cutoff scores and enrollment in a summer enrichment program. The Dream program provides SHSAT preparation to low socioeconomic status students with higher New York State standardized test scores.

Footnote 5: 15The term "education corporation or association" is not defined in the NYSHRL (see Matter of North Syracuse Cent. School Dist. v New York State Div. of Human Rights, 19 NY3d 481, 490 [2012]). The Court of Appeals traced the origins of that term to the Tax Law, which referred to "private, non-sectarian entities that are exempt from taxation under RPTL article 4" (id.). In other words, the term referred to "private, non-sectarian entities that owned 'educational' property utilized for a public purpose" not to the property of a municipal corporation which is held for a public use "i.e., school district property" (id. at 491, 493). As a result of the holding in Matter of North Syracuse (which concluded that the New York State Division of Human Rights lacked jurisdiction to investigate racial harassment complaints against public school districts), the legislature expanded the definition of "educational institution" to include public schools (see Assembly Mem in Support, Bill Jacket, L 2019, ch 116 [extending protection against discrimination, harassment and bullying "to public educational institutions, and not just to private schools, as was held in 2012 by the Court of Appeals in North Syracuse Central Sch. Dist. v. N.Y. State Div. of Human Rights"]). However, it did not amend the definition of "education corporation or association."